# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. Austin M.*, 2012 IL 111194

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. AUSTIN M., a Minor, Appellant. |
| Docket No. | 111194 |
| Filed | August 30, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In delinquency proceedings, there is a *per se* conflict of interest calling for reversal if a minor's attorney functions simultaneously as defense counsel and guardian *ad litem*; and a misdemeanor adjudication for criminal sexual abuse was reversed where the facts in the record showed that retained defense counsel had so functioned, even though he was never appointed as guardian. |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of Ford County, the Hon. Stephen R. Pacey, Judge, presiding. |
| Judgment | Judgments reversed.<br>Cause remanded. |

Counsel on
Appeal

Michael J. Pelletier, State Appellate Defender, Karen Munoz, Deputy Defender, and Jacqueline L. Bullard, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Matthew Fitton, State's Attorney, of Paxton (Michael A. Scodro, Solicitor General, and Michael M. Glick and Erin M. O'Connell, Assistant Attorneys General, of Chicago, of counsel), for the People.

Cathryn Crawford, of Chicago, for *amicus curiae* Children and Family Justice Center.

Marsha Levik, Riya Saha Shah and Tiffany Price, of Philadelphia, Pennsylvania, for *amicus curiae* Juvenile Law Center.

Bruce A. Boyer, of Chicago, for *amicus curiae* Loyola *Civitas* ChildLaw Center.

Mary Ann Scali and Nadia Seeratan, of Washington, D.C., for *amicus curiae* National Juvenile Defender Center.

Justices

JUSTICE BURKE delivered the judgment of the court, with opinion.
Chief Justice Kilbride and Justices Garman and Theis concurred in the judgment and opinion.
Justice Freeman concurred in part and dissented in part, with opinion.
Justice Karmeier concurred in part and dissented in part, with opinion.
Justice Thomas dissented, with opinion.

**OPINION**

¶ 1 Austin M. was adjudicated a delinquent minor after he was found guilty of the offense of criminal sexual abuse (720 ILCS 5/12-15 (West 2006) (now 720 ILCS 5/11-1.50(b))). Austin appealed his adjudication and the appellate court affirmed, with one justice dissenting. 403 Ill. App. 3d 667.

¶ 2 We granted Austin's petition for leave to appeal. Before this court, Austin raises four issues: (1) whether the legal representation he received at his delinquency trial amounted to a denial of his right to counsel as guaranteed by the Juvenile Court Act and by the due

process clauses of the United States and Illinois constitutions; (2) whether he received ineffective assistance of counsel because his attorney labored under a *per se* and/or actual conflict of interest; (3) whether he received ineffective assistance of counsel because of certain acts and omissions by his attorney; and (4) whether he was proved guilty beyond a reasonable doubt.

¶ 3    For reasons that follow, we reverse the judgments of the courts below.

¶ 4                                    I. Background

¶ 5    In August 2006, Ford County State's Attorney Anthony Lee filed delinquency petitions against Ricky M., age 15, and Austin M., age 16, charging them with misdemeanor criminal sexual abuse. It was alleged in the petitions that between July 14, 2005, and July 14, 2006, Ricky and Austin had engaged in acts of fellatio and had fondled the sex organs of each other and two boys, Dillon L.,[1] age 10, and Jonathon L., age 12, who had been foster children living in the M. family foster home. Ricky and Austin were tried at a joint delinquency trial, which commenced on January 19, 2007, and was continued to April 3, 2007. The boys' parents, James (Jim) and Rebecca (Becky) M., hired an attorney to represent both Ricky and Austin at trial.

¶ 6    At a September 25, 2006, pretrial hearing, the court inquired whether the attorney whom Mr. and Mrs. M. had hired was appearing on behalf of the boys as well as the parents. The attorney replied, "I think the minors, Judge." The court then admonished Mr. and Mrs. M. as follows:

> "At this point, [the attorney] is entering an appearance for your sons only. So, he represents them and does not represent you. He represents what's in the best interest of these Minors, which may or may not be what the Minors or the parents think is in their best interest."

¶ 7    The court also admonished the parents that, if the allegations in the delinquency petitions against their sons were proven beyond a reasonable doubt, the boys could be placed on probation, removed from the home and placed in a public or private facility, or committed to the Illinois Department of Juvenile Corrections. The court then asked:

> "Any questions regarding the basic rights of these proceedings, Mr. and Mrs. [M.]?"

¶ 8    Trial began on January 19, 2007. At the outset of trial, the boys' attorney made a statement to the court, explaining his reasons for simultaneously representing both respondents. He also informed the court of his decision to permit the State to present videotaped statements of the alleged victims, Jonathon and Dillon, and a third foster child, Willie C., age 5, in lieu of live courtroom testimony. He stated:

> "I have procedural points—I agreed to proceeding, and I think in a unique, at least, a new way in one respect or two respects—and I wanted to explain my

---

[1]Throughout the record, the alleged victim is identified as D.L. or "Dylan." However, when D.L. was videotaped, he was asked to spell his name and he spelled it "D-I-L-L-O-N." Therefore, this spelling will be used here.

decisions on the record and explain why I believe that's in my client's [*sic*] best interest.

THE COURT: That's fine.

[Defense Counsel]: Yeah, I had, Judge. I first of all have agreed with Mr. Lee [the prosecutor] to proceed. We have three witnesses that are children; Willie [C.], Jonathon [L.] and Dillon [L.], and I have agreed with Mr. Lee that I am going to not oppose their testimony by way of video tape, Judge, a couple video tapes made in July, and one made in October I believe.

I am comfortable doing that in this case. I say that there—I want to make it clear; my clients have consistently denied the allegations that are being made by these complaints and to the extent—with one exception. There was a claim on the admission on the part of Austin, which we dispute, but they have denied this. This is a contested hearing.

Nevertheless, this is a juvenile hearing. I have talked this over pretty carefully with my clients, as well as with their parents, and I been [*sic*] a lawyer for nearly 30 years, and I am comfortable with this in this case because we want to know the truth is ultimately the view of the parents. If something along the nature of these allegations, which are acts of sexual penetration involving children here, but my clients are 15 and 16 years old and the victims are 10 and 12 years old at the time. And I think our, at that time, attitude is we have grave doubts these things occurred.

The boys deny they occurred, but I think the parents and I agree—I think with Mr. Lee as well—that if such acts happened, then it needs to stop. An intervention is not inappropriate by way of government to help these boys if such things happened. You know, so. We are on the same page, and we don't want to cause trauma to anybody. I have a duty to these two boys, nobody else. But we are, we are not—we are seeking the truth this here [*sic*] the same as the Court and the same as the prosecutor is our position. And I am comfortable with proceeding by way of the video tape as opposed to requiring these young children to come into Court at this hearing, and obviously there is pluses and minuses, I suppose, for both sides. We are giving up our right to confront these witnesses in Court.

THE COURT: I assume, that's the case. There is no cross-examination by you.

[Defense Counsel]: No, there won't be. And we dispute their allegations.

THE COURT: I understand.

[Defense Counsel]: And on the other hand, Mr. Lee is giving up the ability to have live testimony which tends to be more persuasive than video tape. Bottomline, I am comfortable with it. The other decision that I made here, Judge, that I want everybody to be clear on, and I want to explain, is I am representing two clients here, and ordinarily, if this were an adult case—I cannot imagine—it is extremely rare I would contest a hearing attempting to represent two individual clients that deserve the benefit of individual representation, separate consideration, and the allegations are kind of—they are pretty widespread.

We are talking about a year's period of time and talking about different possible alleged acts of different kinds. Nevertheless, I think in a juvenile hearing where it is a misdemeanor allegation, where it is a judge proceeding as opposed to a jury proceeding, I am fully capable of handling this, and where I believe the—I don't view such a proceeding as adversarial as it might be if it were an adult case.

I view this as a truth-seeking process on all parts. I explained this to the parents, I think they are comfortable with me being a lawyer for both kids. They agree it is in the best interest and beneficial to everybody that I continue to represent both, but I wanted to say that on the record, Judge.

Now, if the Court or prosecutor has any problem with me doing that, you know, I am ready to hear thoughts. I am comfortable with being a lawyer for both and comfortable with proceeding with the testimony by way of video tape. Thank You."

¶ 9 The boys' attorney also informed the court that, in exchange for permitting the prosecution to present videotaped statements of the three foster children, the State had agreed to ask for a sentence of probation rather than commitment to the Department of Juvenile Justice, in the event that the boys be found guilty. The court asked Jim and Becky M. if they understood this compromise, but did not consult Austin or Ricky.

¶ 10 The matter then proceeded to trial. The State presented two live witnesses, Sergeant Robert Yates, a police officer in the Paxton police department, and Sheree Foley, a child protective investigator with the Department of Children and Family Services (DCFS) in Urbana, Illinois. The only other evidence presented was the videotapes of Sheree Foley's interviews of Dillon, Jonathon and Willie.

¶ 11 The first witness was Sergeant Yates, who testified that he became involved in this case when Sheree Foley, a DCFS worker, came to the Paxton police station on July 14, 2006, and informed him of her investigation into a report of sexual abuse. Yates said he and another officer, Captain Cornett, accompanied Foley to the foster home where the abuse allegedly took place. Foley removed two foster children who were living there, Jonathon L., age 12, and Willie C., age 5, and brought them to the Paxton police station. Yates testified that, after Foley interviewed Jonathon and Willie, the Paxton police department contacted Jim and Becky M., who then brought their sons, Austin and Ricky, to the police station for questioning.

¶ 12 Yates also testified that he was present when Paxton Police Chief Robert Bane questioned Austin and Ricky individually. Yates recalled that Ricky was interviewed first and that Chief Bane told Ricky that he was being accused of "inappropriate behavior," "inappropriate touching," and "coercing others to perform oral sex." Yates said that Ricky appeared extremely nervous, but denied any wrongdoing.[2]

¶ 13 Yates further testified that when Chief Bane questioned Austin, Austin was first asked to sign a form indicating that he had been advised of his *Miranda* rights and that Austin's

[2]Yates testified that the interviews with Austin and Ricky were tape-recorded, but no recordings were introduced at trial.

father, Jim M., who was present during both interviews, signed the same form as a witness. Thereafter, Chief Bane advised Austin, as he had with Ricky, that he was being accused of "inappropriate touching" and "performing oral sex." Yates testified that Austin, like Ricky, denied doing these things. However, he said that Chief Bane continued to ask Austin the same questions over and over again in a way that made it clear that he did not believe that Austin was telling the truth. In response to this repeated questioning, Austin said he let Dillon "suck his dick." Yates said Austin's father immediately interrupted, stating that they wanted to speak to a lawyer and Austin's interview was then concluded.

¶ 14    Defense counsel made no objections to any of Yates' direct testimony. However, on cross-examination the following colloquy took place:

"[Defense Counsel]: You wrote a written report, you are holding that in your hand?

[Yates] A. It's my report, sir.

Q. Okay. I am taking it, you are kind of using that report to—

A. To recall.

Q. —to remember what happened?

A. That is correct.

Q. And that's been a few months?

A. Yes, it has."

¶ 15    The next witness was Sheree Foley, who testified that her involvement in this case was initiated by a child abuse hotline report transmitted by the Vermilion County DCFS on July 14, 2006. According to this report, Dillon L., age 10, who had been a foster child in the M. foster home from August 2005 through June 2006, alleged that he had been sexually abused on several occasions while he was living there. The alleged perpetrators of the abuse were Ricky M. and Austin M., the foster parents' sons.

¶ 16    Foley testified that, although Dillon was no longer living in the M. foster home, she decided to visit the foster home the same evening she received the report because two other foster children—Jonathon L. and Willie C.—were living in the home. Foley said she notified the Paxton police department of her investigation and two Paxton police officers accompanied her to the foster home. Foley removed Jonathon and Willie from the foster home and transported them to the Paxton police station, where she then interviewed the two boys.

¶ 17    When asked about that interview, Foley, without any objection by defense counsel, stated:

"I interviewed both boys, and I got enough information to know that these children needed to be interviewed at the CAC due to the allegations and the type of allegations we did not want to go on interviewing them in the police station. So at that time when we had information from the boys that sexual abuse had—sexual abuse did occur in the home, that [*sic*] Paxton PD brought in the two boys, older boys to interview them, Ricky and Austin."

¶ 18    At about 10 p.m. on July 14, 2006, Jim and Becky M. arrived at the Paxton police station

with Ricky and Austin, who were then questioned by Paxton Police Chief Robert Bane. Foley testified that she was present during the questioning of the boys. She stated that Ricky denied the accusations, but that Austin stated he allowed Dillon[3] to "suck his dick." Foley testified that, after Austin made this statement, Mr. M. said they would like an attorney and the interview was terminated.

¶ 19    Foley also testified that the following morning, July 15, 2006, she conducted videotaped interviews with Willie and Dillon at the Child Advocacy Center (CAC) in Urbana. Jonathon was not reinterviewed at that time because Foley did not feel he was ready to disclose any information. Instead, Jonathon was interviewed three months later, when he was brought to the CAC as part of a new and unrelated sex abuse investigation.

¶ 20    On cross-examination, Foley admitted that Dillon was initially placed in foster care because he had been the victim of sexual abuse while living with his mother. Foley also admitted that between May and June 2006 Dillon had made two unfounded reports of child abuse (not sexual abuse) against Jim and Becky. Dillon was removed from the M. foster home in June 2006 and placed with his grandmother. While staying with his grandmother, Dillon began to "act out" sexually and was found making inappropriate sexual advances toward a young cousin. When the grandmother talked to Dillon about his behavior, he made the accusations of sexual abuse at the M. foster home.

¶ 21    Defense counsel asked Foley why she did not interview Jonathon at the CAC until October 2006. Foley explained that when she interviewed Jonathon on July 14, 2006, he told her that the only inappropriate or sexual touching he had observed while staying at the foster home was between Dillon and Willie. Jonathon also said that Dillon had repeatedly tried to touch him, Ricky, and Austin, but they all refused Dillon's advances. Despite these revelations, Foley described Jonathon as "very closed" and stated that, based on her observations of Jonathon's "body language," she did not believe Jonathon would tell her anything more. For this reason, she did not have him brought to the CAC the next day. In October 2006, however, Jonathon was brought to the CAC for an investigation of another, unrelated sexual abuse incident. Foley said she used this opportunity to question Jonathon about this case.

¶ 22    Defense counsel also questioned Foley about her observations at the time Austin was interviewed at the Paxton police station on July 14, 2006. The following colloquy took place:

"Q. What did he say to your recollection?

A. He talked about, you know, one of the boys in the home; he allowed him to suck his dick.

Q. All right. Well, the reason I am asking it this way is that you phrase it in your

---

[3]Prosecutor Lee asked leading questions throughout his examination of Sheree Foley. Further, when asked about Austin's interview by Chief Bane, Foley could not remember whom Austin allegedly abused without looking at her notes. Foley was permitted to review her notes, after which the prosecutor stated, "All right. We will need to get a copy of whatever page you refer to, as well as we need to get a copy of Officer Yates' police report to be marked as refreshed recollection." No objection was made by defense counsel.

report is [*sic*] you say on page 37, you say he began to talk about Dylan [*sic*] performing sucking his dick, and Mr. [M.] is concerned and the interview stopped; is that true?

A. That's true.

Q. I am curious about the phrase he began to talk about Dylan [*sic*]. I mean, you don't say he said it. You say he began to talk about it.

A. He started to talk about it.

Q. Okay. All right. And it sounds like he was cut off.

A. He was."

¶ 23 After Foley testified, the court viewed the videotapes[4] of Sheree Foley's interviews with Willie and Dillon, which took place at the CAC on July 15, 2006, as well as the videotape of Sheree Foley's interview with Jonathon, which took place at the CAC in October 2006.

¶ 24 The videotape of Dillon's interview shows that Foley spoke with him for approximately 27 minutes. Foley first asked Dillon to tell her about the M. foster home and Dillon began by stating that Austin and Ricky, as well as two of Jim and Becky's other children, Abby and Jennifer, were "mean" to him and "called him names." Dillon then claimed that he witnessed Austin and Ricky "humping" Jennifer and Abby. Dillon also said that Austin and Ricky forced him to "suck their dicks" and that they carried knives and threatened to kill him if he did not do what they said. However, Dillon's main focus was on Austin and Ricky's alleged behavior with their sisters, which he described as "sick."

¶ 25 In the course of the interview, Dillon often contradicted himself. For example, Dillon first stated that he never saw Austin or Ricky forcing anyone else to "suck their dick," but later said it happened to Jonathon. Also, Dillon first said that Becky never hit him, but later said that Becky hit him "everywhere" and that this happened "all the time." His excuse for not telling Jim and Becky anything about the sexual abuse by Austin and Ricky was "they didn't care."

¶ 26 The videotape shows that, during the interview, Dillon became fascinated by some anatomically correct dolls that he found in a bag in the interview room. He spent a good deal of time undressing the dolls and playing with them to describe what he claimed Austin and Ricky were doing to their sisters and to him and Jonathon.

¶ 27 The second videotape showed Foley's July 15, 2006, interview with Willie at the CAC, which lasted just over 20 minutes. It is clear from the videotape that Willie, who was five years old, was very restless. He yawned and stretched and was distracted by a juice box he was drinking. He also expressed frustration with the questions and at one point said, "No, I'm done talking." He claimed that he saw Austin touch Ricky's "wiener" but said this happened in their bedroom and that he was sleeping in his own bedroom when he saw this. Since Willie's room was on a different floor from Austin and Ricky's room, this would have been impossible.

¶ 28 Willie also told a fantastic story about Austin and Ricky hitting people "in their butts"

---

[4]The videotapes have been made a part of the record in this case.

with a shovel. Willie said the police arrived and took people to the doctor because "somebody got killed." Willie also claimed the family dog, Maggie, licked Dillon's "bootie" and said this also happened to "Tucker" (who apparently is another dog). Willie said he never saw Jennifer or Abby naked, but that Chris (an older son of Jim and Becky M.) pulled down his pants and showed him his private part. Finally, Willie said that no one touched him, but if anyone had tried to touch his private parts he would have told Becky.

¶ 29    The last videotape was the recording of Foley's interview of Jonathon at the CAC on October 27, 2006, which lasted about 20 minutes. When asked about the M. foster home, Jonathon's first response was, "I don't know if you know this, but Dillon was sexual at Becky's."

¶ 30    At first, Jonathon said he never saw anything and did not remember anything. However, after much prompting from Foley, he stated that Ricky would make Dillon suck his private part. Jonathon said Ricky and Austin asked him to suck their private parts, but he refused and no one made him do it. Jonathon also said that he saw nothing of a sexual nature with regard to Willie, Jennifer, Abby, or Chris. However, he later stated he saw Austin touch Jennifer over her clothes, but that Jennifer got mad and "smacked" him.

¶ 31    Jonathon said that Dillon often complained about getting hit, but that Dillon would hit Willie. Jonathon also said that Dillon did not listen and that he stole things a lot. When asked if there were problems at the M. foster home, Jonathon said that Ricky had "anger problems" and "when he didn't take his medication he would hit people." Jonathon also said Austin had anger problems and "touching problems." He said that Austin carried a pocket knife and scared him with it. Also, he said that "every day" Austin wanted Dillon or Jonathon in his room and tried to put his "thing" in their butts, but they refused.

¶ 32    After the videotapes were played, the State rested. The defense then called Ricky and Austin's siblings, Anthony, 22, and Abby, 20, as witnesses. After they established that they had been living in the M. home during all or part of the time that Dillon and Jonathon were foster children there, Anthony and Abby testified that they never saw anything of a sexual nature going on between the foster children and Austin and Ricky. After their testimony, the matter was continued.

¶ 33    Trial resumed more than two months later, on April 3, 2007. On this date, the defense continued with testimony from Jim and Becky M., Austin and Ricky's parents.

¶ 34    Becky testified first. She said that she had been married to Jim for 29 years and that they had eight children—three biological children and five adopted children. The three biological children were Anthony, 22 (who had testified earlier), Nicholas, 27, and Sarah, 25. The adopted children were Chris, 20, Abby, 18, and Austin, 16 (who are biological siblings), as well as Jennifer, 18, and Ricky, 15. Austin was adopted when he was only five weeks old; Ricky was adopted when he was 15 months old. Becky also testified that she has worked outside the home as a teacher's aide since 1993.

¶ 35    After the preliminary questions, defense counsel asked Becky about the allegations against Austin and Ricky:

> "[Defense counsel] Q. Fair to say that you disapprove of sex among children?
>
> [Becky] A. Yes.

Q. Be fair to say that—let me ask you this. These are your adopted kids, Ricky and Austin?

A. Yes.

Q. You love them?

A. Yes.

Q. You want the best for them?

A. Yes.

Q. These allegations cause you concern, do they not?

A. Yes.

Q. Would you participate in a coverup of such activity to try to prevent the truth from coming out?

A. No.

Q. You don't believe these allegations are true; is that right?

A. No.

Q. But you're concerned?

A. Yes.

Q. You can't be with your kids every minute of the day, can you?

A. No.

Q. And things can happen outside your knowledge?

A. Yes.

Q. Is that right? When you heard these allegations, did you talk to Austin about it?

A. Yes.

Q. How often did you talk to him?

A. I probably did it quite often because I was getting mad because I was trying to use anything, you know, tell the truth, we can get help, you know, you can't lie about this. I did it many, many times or tried to trick him saying, you know something but they always stuck to this has never happened."

¶ 36   Becky was also questioned at length about several photographs she had taken which depicted the layout of the second floor of the family home. Becky testified that the door to the bedroom used by the foster children could not be closed because it was partially off its hinges. In answer to questions posed by defense counsel, Becky also established: that Jonathon had come to their foster home in 2004, that there had been no allegations of sexual abuse prior to Dillon's arrival, that Austin and Ricky were not allowed to babysit for the foster children, and that Austin and Ricky did not carry pocket knives because Ricky had once used a knife to vandalize a school bus.

¶ 37   Becky was then asked if she ever suspected any sexual activity between any of the boys. Becky stated that she did have some suspicion regarding Dillon and Jonathon. Becky explained that Jonathon had complained about Dillon bothering him while he was getting

dressed. For this reason, Becky had Dillon come downstairs in the morning to dress. Becky also testified that Dillon had been difficult to control and needed special supervision. Becky noted that, soon after Dillon arrived, she took him to a counseling session. After the session, while she was talking to the counselor, Dillon was supposed to wait in the waiting room, but instead left the building. She and the counselor later found him in her van, naked. Also, a short time after Dillon came to her home, she found Dillon and Jonathon together in Jonathon's bed. From then on, throughout the time that Dillon was in her home, she required Dillon to stay downstairs with her until he started to get sleepy. Becky said this was necessary because Dillon did not fall asleep easily and she did not want him upstairs disturbing the other boys.

¶ 38    Becky also noted that Dillon had a problem stealing things at school, at home, and in the community. She said if Dillon was unsupervised he would go into people's rooms and steal things. For this reason, Dillon was not allowed upstairs during the day.

¶ 39    On cross-examination, the prosecutor asked Becky about some "bad acts" by Austin when he was six years old and alluded to some recent accusations of improper touching by Austin. The prosecutor also asked Becky a number of questions about Austin's alleged admission at the police station, even though Becky explained that she had not been present. The following colloquy between the prosecutor and Becky took place:

"Q. Did Jim tell you about Austin starting to make that disclosure?

A. No.

Q. Did you become aware that Austin started disclosing what was going on between he and Dylan [*sic*]?

A. When I got the police report and I filled in all the numbers with which child, that's when I read it.

Q. When you were trying to get the truth out of Austin, did you ask him about that statement?

A. Yes, I did.

Q. Did you allow him to complete his story about what was going on there?

A. Yeah.

Q. Do you believe Austin wasn't telling the truth about allowing Dylan to suck his penis?

A. No. Austin didn't have much to do with him. He had other friends.

Q. So you believe Austin wasn't telling the truth about that?

A. That he didn't do it?

Q. His statement to the police that he did do it and was engaged in doing it with Dylan [*sic*]?

A. And I asked him and he said he never said that.

Q. Did you have any discussions with your husband about cutting off the questions when Austin started disclosing about the sexual conduct between he and Dylan [*sic*]? Did you ask your husband why he cut that off?

A. Because they were kind of getting nasty and saying you're a liar."

¶ 40    Until now, defense counsel did not object to any of the prosecutor's questions. At this point, defense counsel made an objection based on hearsay, which the court overruled. The questioning then continued:

"Q. So it's your understanding from your husband that he cut it off because it was getting nasty?

A. They were kind of bullying him. He was only sixteen.

Q. You used the word, nasty. Is that what you and Jim discussed?

A. Yes—

THE COURT: Next question, Mr. Lee. This question has been asked and answered. She's answered your question."

¶ 41    The prosecutor also asked Becky if she remembered telling Sheree Foley, on July 14, 2006, that Jonathon had previously been a victim of sexual abuse[5] and that he "allowed it to happen." The following colloquy took place:

"Q. Do you recall making a statement to Sheree Foley to the effect that Jonathon allowed it to happen to him; do you recall making that statement?

A. No.

Q. You felt it was significant that Jonathon had previously been sexually abused; is that correct?

A. Did I feel what?

Q. You felt it was significant that Jonathon had been sexually abused prior to these allegations involving your home, correct?

A. Significant to what?

Q. You felt it was important to make the DCFS people aware that Jonathon had been previously abused, correct?

A. I suppose I did.

Q. And you also felt the same way with regard to Dylan [sic], that it was important that Dylan [sic] had been sexually abused prior to what was alleged to have happened in your home, correct?

A. Yeah."

¶ 42    Becky was then asked if she knew anything about Willie's background and she indicated that she did not know much about that. Still, the prosecutor continued:

"Q. Well you certainly had some knowledge or information with regard to Jonathon and Dylan [sic] and their history, but you are claiming you didn't have knowledge or information with regard to Willie's history?

A. Jonathon's came out a year after we had him. All of a sudden an investigator

---

[5]This line of questioning was prompted by testimony that had been provided by Sheree Foley on direct examination, without objection by defense counsel.

came to our house and—

> Q. It's a pretty straightforward question.
>
> THE COURT: Mr. Lee, she's answering your question."

¶ 43 Becky continued to try to answer the prosecutor's questions to the best of her ability, yet the prosecutor persisted on asking Becky questions about Willie, about which she had no knowledge. Defense counsel never objected to any of the above questions, but when the prosecutor—on two more occasions—asked the court to admonish Becky to answer his questions with regard to Willie, the court replied: "That's responsive. Next question." And later, "I'm not sure why the question is necessary." Finally, after the second admonishment by the court, defense counsel lodged an objection without stating any grounds. The court never ruled on the objection but told the prosecutor to move on to another question.

¶ 44 On redirect, defense counsel asked Becky about Willie's videotaped testimony and what he said about another older son, Chris. The prosecutor immediately objected to the question. Defense counsel then tried to explain his rationale for asking the question when the court interjected:

> "THE COURT: She said she doesn't believe the allegations. I'm not sure it's appropriate to have her comment on the testimony of the other witnesses. She's already said she disagrees with it.
>
> [Defense Counsel]: Okay, thanks. I understand the court's ruling."

¶ 45 The court repeated that it understood Becky's position, so defense counsel opted to ask no further questions of the witness.

¶ 46 The last witness was Jim M., Austin and Ricky's father. He testified that he was 61 years old, a college graduate, and that he worked full time as a file librarian in the X-ray room of the Carle Hospital.

¶ 47 When questioning Jim about the allegations against Austin and Ricky, defense counsel asked:

> "Q. You love your kids as well as your wife?
>
> A. Yes, I do.
>
> Q. And you want what's best?
>
> A. Pardon me?
>
> Q. You want what's best for your kids?
>
> A. Yes, I do.
>
> Q. You don't approve of child sex between children, do you?
>
> A. No.
>
> Q. And you would want to know if there was oral or anal sex involving Ricky and Austin and either Jonathan or Dylan [*sic*] or anyone; is that right?
>
> A. Yes.
>
> Q. And you would accept the government's help in trying to deal with issues like that if you believed that had happened?

A. Yes, I would.

Q. You understand that at this point we are dealing with misdemeanor juvenile delinquency allegations in this case?

A. Yes.

Q. But should this type of behavior persist among boys after they turn the age of seventeen it becomes an adult criminal problem?

A. Yes, I understand that.

Q. In other words, you understand the seriousness potential seriousness [*sic*] of such behavior?

A. Yes, I do.

Q. And the importance of dealing with it if such should have occurred?

A. Yes.

Q. Fair to say you have grave doubts or you are concerned that this did not happen, these allegations are not true, fair to say?"

¶ 48 Jim agreed that he did not believe the allegations against his sons. Defense counsel then asked Jim about Austin's police interview, stating: "And I believe your recollection of how that took place is a little different than what the testimony has been up to this point?" Jim agreed and then described the interview as follows:

"We went into the interview room. I was asked—Austin was asked to sign a form that was basically his *Miranda* rights. Then they started to ask him about knowing any inappropriate sexual behavior that went on in the house, and he said he didn't know. They asked him that question several times, and he responded negatively. I can't remember the name of the officer. He was sitting across from Austin. He asked him if Dillon ever performed oral sex—or yeah, if Dillon ever performed oral sex on him. He did not respond. Then Captain Bane, who was standing in the corner of the room yelled at him, did Dillon perform oral sex on you, and he still didn't respond, and at that point I thought that was abusive, and I asked that the interview end. Captain Bane kept talking, so I could see that the interview was not ending. At that point, I asked that we—I stated we needed a lawyer, and then the interview ended."

¶ 49 Counsel then asked Jim whether he ever heard Austin begin to say that he allowed oral sex to be performed on him by Dillon. Jim responded, "No."

¶ 50 After Jim testified, Austin and Ricky, on advice of counsel, told the court that they had decided not to testify. The defense then rested.

¶ 51 In rebuttal, the prosecution recalled Sheree Foley. She testified, once again, that she heard Austin say he allowed Dillon to "suck his dick" before James ended the interview with the police. On cross-examination, however, Foley admitted that there was no available tape recording of the interview and she had no clear independent recollection of it since it took place nearly a year before. She said she based her testimony on her notes, which she prepared shortly after the interview. But she also admitted that her notes on this matter consisted of a single sentence. Further, Foley admitted that Chief Bane had been "very loud and very aggressive" when questioning Austin.

¶ 52    After Foley testified in rebuttal, the court listened to closing arguments. The prosecutor made forceful arguments, stressing the consistencies in the three foster children's videotaped statements. The prosecutor also implied that Jim and Becky were aware of Austin and Ricky's behavior and suggested that it was a "red flag" that the parents had "segregated" Austin and Ricky in the attic bedroom.

¶ 53    Defense counsel then began his argument, stating:

"I guess it's kind of almost impossible to keep this from sounding like an adversarial criminal proceeding just like an adult trial, and in the heat of the moment, the prosecutor tries to portray his case in the best light possible, the defense lawyer does the same. There is certainly some similarities to a trial and that is—but I think there are some differences here. I think I'd like to keep our attention—I believe that we all have the same ultimate goal in mind, and that is the best interests of these kids.

The parents have both testified that their values are values that prohibit this type of child sexual behavior. They are opposed to it in the strongest possible terms. If this is happening, they want it known and they want their kids to get help so it doesn't happen again. That's what they have testified to, and they deserve credibility on that."

¶ 54    Defense counsel continued to extol the virtues of the parents and their three biological children, noting that "they're not in favor of raising kids the wrong way." Defense counsel then continued, stating:

"Sure we all get caught up, but ultimately they want what is best for Ricky and Austin. They understand that this kind of behavior, if it occurred, is wrong; it's against the rules; it's against the law; it is—it's unwholesome; it's unhealthy, and it's going to lead to a bad end if it occurred. And they don't think it happened. They have questioned the kids over and over again."

¶ 55    Defense counsel encouraged the court, as trier of fact, to do "the right thing" and "urge[d] the Court that not guilty is the right finding," but conceded that "[i]t's a tough case." Defense counsel also reiterated much of what was said by the three foster children in their videotapes, pointing out some of the more ludicrous stories and inconsistencies. However, no argument was made with regard to Austin's alleged statement to the police—the most hotly contested aspect of the case.

¶ 56    Following closing argument, the case was taken under advisement. The court did not enter its ruling on the matter until August 28, 2007—nearly five months after the close of trial. In a written adjudication order, the court apologized for the delay, but explained that it had "struggled evaluating the credibility" of the witnesses. The court then stated its findings as to each of the witnesses: Willie's testimony "lacked credibility," Jonathon's testimony was "only slightly more credible," and Dillon's testimony was "also suspect." The court noted the contradictory evidence regarding Austin's alleged admission, but concluded as follows:

"This is the classic case where the State has introduced evidence sufficient to prove that something probably happened, but absent an admission, not proof beyond a reasonable doubt.

This is also, with respect to Austin, a case in which the respondent minor's

admission has been proved beyond a reasonable doubt and, together with the State's other evidence, is sufficient to meet the State's burden."

¶ 57        Because Ricky had admitted to no wrongdoing, the court denied the petition with respect to Ricky. However, because the court found that Austin's alleged admission was proved beyond a reasonable doubt, the court held the delinquency petition had been proven beyond a reasonable doubt with respect to Austin.

¶ 58        At a subsequent disposition hearing, the court heard, for the first time, that Austin had a low IQ and struggled at school with learning disabilities. The court acknowledged Austin's limitations, but held that Austin, who was then 18 years old, needed to take responsibility for his actions. In accord with the prosecution's prior agreement, the court sentenced Austin to 24 months' probation, along with 50 hours of public service work.

¶ 59        Austin appealed the trial court's decision and in the appellate court raised the following issues: (1) whether he was deprived of counsel as guaranteed by the Juvenile Court Act and our state and federal constitutions; (2) whether he received ineffective assistance of counsel; and (3) whether he was proved guilty beyond a reasonable doubt. The appellate court rejected all of the claims, with one justice dissenting. Justice Appleton, in dissent, held that the evidence did not support a finding that Austin was proved guilty beyond a reasonable doubt.

¶ 60        We granted Austin's petition for leave to appeal in this court. In addition, we permitted the Loyola *Civitas* ChildLaw Center; the Northwestern University School of Law Bluhm Legal Clinic's Children and Family Justice Center; the Juvenile Law Center; and the National Juvenile Defender Center to submit a brief as *Amici Curiae* in support of Austin.

¶ 61                                          II. Analysis
¶ 62                        A. *Minor's Right to Counsel in a Delinquency Trial*
¶ 63        Austin's initial claim on appeal is that the legal representation he received at his delinquency trial amounted to a denial of his right to counsel as guaranteed by the Juvenile Court Act and by the due process clauses of our state and federal constitutions. More specifically, Austin contends that, as a minor tried for a criminal offense in a delinquency proceeding, he had the right to a *defense attorney*, that is, an attorney who gives his client his undivided loyalty, who zealously safeguards his client's rights and confidences, and who acts in accordance with his client's wishes. Austin asserts that he was deprived of this type of counsel because his attorney, who represented both him and his brother Ricky, performed less as a defense attorney and more as a guardian *ad litem* (GAL).

¶ 64        Austin contends that a GAL, unlike a defense attorney, owes a duty to the court and to society and may disregard a minor client's wishes if the GAL believes it is in the minor's best interests. Austin argues that his attorney, though not actually appointed as a GAL, believed that to be his role and that this notion was reinforced by the trial court. Further, Austin contends that his attorney's "hybrid representation" deprived him of his statutory and constitutional right to counsel and constitutes a *per se* conflict of interest requiring reversal of his adjudication.

¶ 65        The State asks us to reject this claim. The State argues that Austin did not receive "hybrid

-16-

representation" because Austin's attorney was never appointed as his GAL. The State acknowledges that the appellate court held "[a]lthough the trial court never expressly appointed [Austin's attorney] as guardian *ad litem*, both the court and [the attorney] himself conceived his role as that of a guardian *ad litem*—representing the minors' and society's best interests—rather than that of a traditional defense attorney." 403 Ill. App. 3d at 683-84. However, the State contends this was error. The State also maintains that even if Austin's attorney did, in fact, function as both counsel and GAL at Austin's delinquency trial, it is of no moment because this type of dual representation does not constitute a *per se* conflict of interest. According to the State, for hybrid representation to be reversible error, there must be evidence of an actual conflict of interest resulting from the hybrid representation. Further, the State argues that nothing in the record indicates that Austin's attorney's performance was compromised in any way due to an actual conflict of interest. The State concludes that Austin received the counsel to which he was entitled.

¶ 66    Austin's claim requires us to decide two issues: whether "hybrid representation" is inconsistent with the statutorily and constitutionally guaranteed right to counsel afforded minors in delinquency proceedings, and if so, whether, under the facts of this case, Austin's attorney performed the dual role of defense attorney and GAL when representing Austin at his delinquency trial even though he was not appointed as such. We consider first the nature of the statutorily and constitutionally guaranteed right to counsel afforded minors in delinquency proceedings. Our review as to this issue is *de novo*. See *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 201 (2009) (legal issues involving questions of due process and statutory construction are subject to *de novo* review).

¶ 67    In determining the nature of the right to counsel afforded juveniles in delinquency hearings, we first look to the Juvenile Court Act (Act). Section 1-5 of the Act sets forth the "[r]ights of parties to proceedings." 705 ILCS 405/1-5 (West 2006). It provides in pertinent part:

"No hearing on any petition or motion filed under this Act may be commenced unless the minor who is the subject of the proceeding is represented by counsel. Notwithstanding the preceding sentence, if a guardian ad litem has been appointed for the minor *under Section 2-17 of this Act* and the guardian ad litem is a licensed attorney at law of this State, or in the event that a court appointed special advocate has been appointed as guardian ad litem and counsel has been appointed to represent the court appointed special advocate, the court may not require the appointment of counsel to represent the minor unless the court finds that the minor's interests are in conflict with what the guardian ad litem determines to be in the best interest of the minor." (Emphasis added.) 705 ILCS 405/1-5(1) (West 2006).

¶ 68    The second sentence in the paragraph above was added to section 1-5(1) by Public Act 93-539 and became effective on August 18, 2003. It qualifies a minor's right to counsel in situations where a GAL has been appointed for the minor under section 2-17 of the Act, which relates to abuse and neglect proceedings. Section 2-17(1) provides, in pertinent part:

"Immediately upon the filing of a petition alleging that the minor is a person described in Sections 2-3 or 2-4 [705 ILCS 405/2-3, 2-4] of this Article, the court

-17-

shall appoint a guardian ad litem for the minor if:

> (a) such petition alleges that the minor is an abused or neglected child[.]" 705 ILCS 405/2-17(1)(a) (West 2006).

¶ 69　Section 2-17 further provides in paragraph (1) that the appointed guardian *ad litem* "shall represent the best interests of the minor and shall present recommendations to the court consistent with that duty." 705 ILCS 405/2-17(1) (West 2006). Thus, in an abuse and neglect proceeding, a GAL is, in essence, an arm of the court. See *In re Mark W.*, 228 Ill 2d 365, 374 (2008) ("A guardian *ad litem* functions as the 'eyes and ears of the court' and not as the ward's attorney."). When a minor is the subject of an abuse or neglect petition, the appointed GAL is required to meet with the minor, assess the circumstances, and determine what disposition might be in the minor's best interest. 705 ILCS 405/2-17(1), (8) (West 2006). The GAL also has a duty to report back to the court and to provide the court with the GAL's opinion of what disposition would be in the minor's best interests. 705 ILCS 405/2-17(1) (West 2006). The GAL's duty is to the court and to seeing that the minor's "best interests" are represented, regardless of whether the GAL's belief as to the minor's "best interests" comports with what the minor wants. See *In re Mark W.*, 228 Ill. 2d at 374 ("The traditional role of the guardian *ad litem* is not to advocate for what the ward wants but, instead, to make a recommendation to the court as to what is in the ward's best interests."); *In re B.K.*, 358 Ill. App. 3d 1166 (2005).

¶ 70　By adding the second sentence to section 1-5(1), the legislature apparently believed that when a minor is the subject of an abuse or neglect petition and is appointed a GAL who is also an attorney at law, the minor's interests are sufficiently protected so that the minor need not be represented by separate counsel. This makes sense, both fiscally and practically. See *In re B.K.*, 358 Ill. App. 3d 1166, 1174 (2005) (in situations where no significant conflict exists, it is financially and functionally prudent to appoint a single attorney to perform both roles).

¶ 71　Unlike abuse and neglect proceedings, there is no requirement that a guardian *ad litem* be appointed in delinquency proceedings. See 705 ILCS 405/2-17(1)(a) (West 2006). A guardian *ad litem* may be appointed in a delinquency proceeding if the minor has no interested parent or legal guardian, if the interests of the parent(s) differ from the minor's, or if counsel believes the juvenile is unable to act in his or her own best interests. See 705 ILCS 405/2-17(3) (West 2006); *In re B.K.*, 358 Ill. App. 3d at 1170.

¶ 72　In section 5-170 of the Act, however, when discussing a minor's right to counsel *in a delinquency proceeding* the legislature provides as follows:

> "(b) In a judicial proceeding under this Article [Article V, dealing with delinquent minors], a minor may not waive the right to the assistance of counsel *in his or her defense*." (Emphasis added.) 705 ILCS 405/5-170(b) (West 2006).

¶ 73　Thus, according to the plain language of the Act, a minor in a delinquency proceeding has a nonwaivable right to be represented by a *defense attorney*. There is no statutory exception which would permit representation by a GAL—even one who is also an attorney at law.

¶ 74　Minors in delinquency proceedings also have a constitutional right to counsel. The

unconditional right to counsel and, in particular, the *effective assistance* of counsel, in delinquency proceedings was first recognized by the United States Supreme Court, in *In re Gault*, 387 U.S. 1 (1967).

¶ 75    In *Gault*, the Court considered "the precise impact of the due process requirement [upon] proceedings" "by which a determination is made as to whether a juvenile is a 'delinquent' as a result of alleged misconduct on his part, with the consequence that he may be committed to a state institution." *Gault*, 387 U.S. at 13-14. After discussing the history and theoretical underpinnings of the juvenile court system, the Court concluded:

> "Failure to observe the fundamental requirements of due process has resulted in instances, which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact and unfortunate prescriptions of remedy. Due process of law is the primary and indispensable foundation of individual freedom. It is the basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the state may exercise. As Mr. Justice Frankfurter has said: 'The history of American freedom is, in no small measure, the history of procedure.' But in addition, the procedural rules which have been fashioned from the generality of due process are our best instruments for the distillation and evaluation of essential facts from the conflicting welter of data that life and our adversary methods present. It is these instruments of due process which enhance the possibility that truth will emerge from the confrontation of opposing versions and conflicting data. 'Procedure is to law what "scientific method" is to science.' "*Gault*, 387 U.S. at 19-21.

As to a minor's right to counsel, the *Gault* Court held:

> "A proceeding where the issue is whether the child will be found to be 'delinquent' and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution. The juvenile needs the assistance of counsel to cope with problems of law, to make skilled inquiry into the facts, to insist upon regularity of the proceedings, and to ascertain whether he has a defense and to prepare and submit it. The child 'requires the guiding hand of counsel at every step in the proceedings against him.' " *Gault*, 387 U.S. at 36.

¶ 76    It is clear to us that a juvenile's right to counsel in a delinquency proceeding is firmly anchored in both due process and our statutory scheme. In fact, with the exception of the right to a jury trial, the fourteenth amendment to the United States Constitution extends to delinquent minors all of the basic rights enjoyed by criminal defendants. See *Gault*, 387 U.S. at 30-31, 33, 41, 51, 55 (self-incrimination, notice, confrontation, cross-examination, and counsel); *In re Winship*, 397 U.S. 358, 368 (1970) (reasonable doubt); *Breed v. Jones*, 421 U.S. 519, 529, 531 (1975) (double jeopardy). Moreover, since *Gault*, the need for zealous advocacy to vindicate the constitutional rights of minors in delinquency proceedings has become even greater. With the Juvenile Justice Reform Provisions of 1998, along with a number of other amendments to the Juvenile Court Act since 1999, our legislature has transformed the Act, making juvenile delinquency proceedings more akin to criminal prosecutions. See *People v. Taylor*, 221 Ill. 2d 157, 165 (2006) (amendatory changes which

became effective in 1999, "radically altered" the Juvenile Court Act and "largely rewrote article V of the Act to provide more accountability for the criminal acts of juveniles and, from all appearances, to make the juvenile delinquency adjudicatory process look more criminal in nature"). Although rehabilitation is still an important goal of delinquency proceedings, they have become more punitive and less confidential. See *In re A.G.*, 195 Ill. 2d 313, 317 (2001) (the 1998 revisions to the Act "represent[ ] a fundamental shift from the singular goal of rehabilitation to include the overriding concerns of protecting the public and holding juvenile offenders accountable for violations of the law"). In many cases, minors who are found delinquent are subject to serious, life-altering consequences.

¶ 77　　Given the above, the type of "counsel" which due process and our Juvenile Court Act require to be afforded juveniles in delinquency proceedings is that of *defense counsel*, that is, counsel which can only be provided by an attorney whose singular loyalty is to the defense of the juvenile.[6]

¶ 78　　Our inquiry does not end here. We must still consider whether it is constitutionally and statutorily permissible for a single attorney to function as both defense counsel and GAL when representing a minor in a delinquency proceeding. Austin contends that such dual representation constitutes a *per se* conflict of interest. The State, however, maintains that there must be evidence of an actual conflict of interest resulting from the hybrid representation. We agree with Austin.

¶ 79　　It has long been recognized that the right to effective assistance of counsel includes the right to conflict-free representation. See *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008); *People v. Morales*, 209 Ill. 2d 340 (2004). In *People v. Washington*, 101 Ill. 2d 104, 109-10 (1984), we held:

>　　"An accused's sixth amendment right to effective assistance of counsel is a fundamental right. (*Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708; *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct.

---

[6]Both Austin and the *amici* have cited a number of legal publications and law review articles which set forth recommendations, standards, and guidelines regarding the representation to be afforded juveniles in delinquency proceedings. These authorities maintain that proper administration of the juvenile justice system requires a juvenile in delinquency proceedings to have the effective assistance of defense counsel, not "best interests" representation. In situations where a guardian *ad litem* must be appointed, it is recommended that the role be fulfilled by a separate person who may, but need not be, an attorney. See National Council of Juvenile and Family Court Judges, Juvenile Delinquency Guidelines, *Improving Court Practice in Juvenile Delinquency Cases* 30-31 (2005), available at http://www.ncjfcj.org; National Advisory Committee for Juvenile Justice and Delinquency Prevention, *Standards for the Administration of Juvenile Justice*, Commentary to § 3.134, at 278-79 (1980), available at http://www.eric.ed.gov; National Juvenile Defender Center, *Role of Juvenile Defense Counsel in Delinquency Court* 7 (2009), available at http://www.njdc.info; *Recommendations of the UNLV Conference on Representing Children in Families: Child Advocacy and Justice Ten Years After Fordham*, 6 Nev. L.J. 592, 609 (2006); *Recommendations of the Conference on Ethical Issues in the Legal Representation of Children in Illinois*, 29 Loy. U. Chi. L.J. 377, 382 (1998).

457.) The assistance of counsel means assistance which entitles an accused to the undivided loyalty of his counsel and which prohibits the attorney from representing conflicting interests or undertaking the discharge of inconsistent obligations. (*People v. Franklin* (1979), 75 Ill. 2d 173; *People v. Kester* (1977), 66 Ill. 2d 162; *People v. Stoval* (1968), 40 Ill. 2d 109.) In order to assure and protect these rights, the defendant need not show prejudice in order to justify a reversal of his conviction if the attorney representing him has an actual or possible conflict of professional interests. *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457; *People v. Robinson* (1979), 79 Ill. 2d 147; *People v. Fife* (1979), 76 Ill. 2d 418; *People v. Coslet* (1977), 67 Ill. 2d 127; *People v. Stoval* (1968), 40 Ill. 2d 109."

¶ 80    More recently, in *People v. Taylor*, 237 Ill. 2d 356 (2010), we discussed the difference between *per se* conflicts and actual conflicts of interest. Citing *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008), and *People v. Spreitzer*, 123 Ill. 2d 1, 13-14 (1988), we explained that a *per se* conflict of interest will be found to exist where certain facts about a defense attorney's status engender, by themselves, a disabling conflict. *Taylor*, 237 Ill. 2d at 374. A *per se* conflict has been found in situations where: (1) defense counsel had a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) defense counsel contemporaneously represented a prosecution witness; and (3) defense counsel was a former prosecutor who had been personally involved in the prosecution of defendant. *Taylor*, 237 Ill. 2d at 374; *People v. Morales*, 209 Ill. 2d 340, 345-46 (2004).

¶ 81    As we explained in *Washington*, the reason for having a *per se* rule prohibiting representation by an attorney with possible conflicting interests is that certain associations may have "subliminal effects" on counsel's performance which are difficult to detect and demonstrate. *Washington*, 101 Ill. 2d at 110. See also *Spreitzer*, 123 Ill. 2d at 16; *People v. Daly*, 341 Ill. App. 3d 372, 376 (2003) (the *per se* conflict rule is designed to avoid unfairness to the defendant, who may not be able to determine whether his representation was affected by the conflict). Accordingly, if a *per se* conflict is established, the defendant need not show that the conflict affected the attorney's actual performance in order to secure a reversal of his conviction. *Taylor*, 237 Ill. 2d at 374-75; *People v. Stoval*, 40 Ill. 2d 109, 113 (1968). If a *per se* conflict is not established, reversal will require a showing of an actual conflict.

¶ 82    An actual conflict generally, if not exclusively, involves joint or multiple representation. *Taylor*, 237 Ill. 2d at 375; *Spreitzer*, 123 Ill. 2d at 17. In actual conflict situations the accused need not prove prejudice in that the conflict contributed to the conviction, but it is necessary to establish that an actual conflict of interest adversely affected the lawyer's performance. *Taylor*, 237 Ill. 2d at 375-76 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)). In other words, the defendant must point to some specific defect in his counsel's strategy, tactics, or decisionmaking attributable to the alleged conflict of interest. *Taylor*, 237 Ill. 2d at 376.

¶ 83    When deciding whether a *per se* conflict of interest exists, the reviewing court should make a "realistic appraisal of defense counsel's professional relationship to someone other than the defendant under the circumstances of each case." (Internal quotation marks omitted.) *People v. Daly*, 341 Ill. App. 3d at 376 (quoting *People v. Hernandez*, 246 Ill. App. 3d 243,

-21-

249 (1993)). Having done so here, we find there is an inherent conflict between the professional responsibilities of a defense attorney and a GAL. See *In re B.K.*, 358 Ill. App. 3d 1166, 1170-71 (2005) ("We are mindful there are inherent conflicts that exist when an attorney acts as both a juvenile's attorney as well as his guardian *ad litem*.").

¶ 84    In a delinquency proceeding, when counsel attempts to perform the role of GAL as well as defense attorney, the risk that counsel will render ineffective assistance or that an actual conflict of interest will arise is substantial. See *State v. Joanna V.*, 2004-NMSC-024, ¶ 13, 136 N.M. 40, 94 P.3d 783 ("Given the natural tension between the roles of GAL and defense counsel, there is a heightened potential that an attorney may become compromised by attempting to do both."). Moreover, the subliminal effect on counsel who attempts to perform both roles may be subtle and not easily detected or demonstrated—particularly by the juvenile being represented.

¶ 85    As noted earlier, there is no requirement that a guardian *ad litem* be appointed in delinquency cases. Therefore, when a guardian *ad litem* is appointed in a delinquency case, it is generally because there is no interested parent or legal guardian to represent the child's best interests. In these situations, the GAL must act in the role of a concerned parent, which is often in opposition to the position of defense counsel. See *In re Lisa G.*, 504 A.2d 1, 5 (N.H. 1986). Further, a GAL—unlike a defense attorney—owes a duty to the court and to society. A guardian *ad litem* need not zealously pursue acquittal if he does not believe acquittal would be in the best interests of the minor or society.

¶ 86    When counsel attempts to fulfill the role of GAL as well as defense counsel, the risk that the minor's constitutional and statutory right to counsel will be diluted, if not denied altogether, is too great. See *In re Lisa G.*, 504 A.2d at 5; *In re Dobson*, 212 A.2d 620, 622 (Vt. 1965) ("[A] lawyer attempting to function as both guardian ad litem and legal counsel is cast in the quandry [*sic*] of acting as both attorney and client, to the detriment of both capacities and the possible jeopardizing of the infant's interests."). Even though a delinquency trial is not as adversarial as a criminal trial, the State still has the burden of proving that the juvenile committed the alleged offense beyond a reasonable doubt. Only a dedicated and zealous advocate can hold the State to that burden. We conclude, therefore, that the interests of justice are best served by finding a *per se* conflict when minor's counsel in a delinquency proceeding simultaneously functions as both defense counsel and guardian *ad litem*.

¶ 87    Having reached this conclusion, we now consider whether the facts of this case demonstrate that Austin's defense counsel, though not actually appointed as GAL, provided "hybrid representation," that is, that he functioned as both GAL and defense counsel in the case at bar. To make this determination, we turn to the record.

¶ 88    Initially, we note that Austin's parents hired the attorney who represented Austin and Ricky in the delinquency proceedings. There is no dispute, therefore, that the boys' attorney was hired to perform the role of defense counsel and, as such, he cross-examined prosecution witnesses, presented witnesses in defense, made objections, and provided closing argument. The question before us, however, is not whether Austin's attorney performed the duties of defense counsel. Clearly, he did. The question is whether Austin's attorney misperceived the

role of defense counsel in juvenile delinquency proceedings to be some type of hybrid "best interests" representation and, based on that misperception, provided something other than the zealous representation to which Austin was entitled. Thus, in examining the record, our focus is on evidence that Austin's defense attorney functioned as GAL or "best interests" counsel.

¶ 89     We begin by noting that, prior to trial, at a hearing on September 25, 2006, the court explained the respondents' right to counsel to their parents, Jim and Becky M., stating the following:

>       "At this point, [respondents' attorney] is entering an appearance for your sons only. So, he represents them and does not represent you. *He represents what's in the best interest of these Minors, which may or may not be what the Minors or the parents think is in their best interest.*" (Emphasis added.)

¶ 90     In describing the role of Austin's attorney, the court gave the classic description of a guardian *ad litem*. Thus, although the trial court did not appoint Austin's attorney as a GAL, the court, itself, perceived that to be his role. Further, Austin and his parents were advised by the court, in no uncertain terms, that the type of counsel who would be representing Austin at trial was not counsel in his defense but, rather, the "best interests" advocacy of a GAL. The court's comments are also significant because Austin's attorney never attempted to correct the court's description of his representational role. The reason, it seems, is that Austin's attorney, too, saw his role more as that of a guardian *ad litem* than defense counsel, as his comments at the beginning of trial demonstrate.

¶ 91     In the background section above, we noted that before the delinquency trial began Austin's attorney explained his rationale for representing both Austin and Ricky and for allowing the admission of the videotaped statements. In the course of those explanations, Austin's attorney made it clear that he was aligning himself with Austin's parents, the prosecution, and the trial court in an attempt to do what he believed would be in the "best interests" of his clients. For example, Austin's attorney admitted that he was not giving Austin and Ricky the same consideration he would give adult criminal defendants. He said:

>       "I am representing two clients here, and ordinarily, if this were an adult case—I cannot imagine—it is extremely rare I would contest a hearing attempting to represent two individual clients that deserve the benefit of individual representation, separate consideration, and the allegations are kind of—they are pretty widespread."

¶ 92     His explanation for representing both Austin and Ricky was:

>       "I don't view such a proceeding as adversarial as it might be if it were an adult case. *I view this as a truth-seeking process on all parts.* I explained this to the parents, I think they are comfortable with me being a lawyer for both kids. They agree it is *in the best interest and beneficial to everybody* that I continue to represent both." (Emphasis added.)

¶ 93     Also, when explaining why he was allowing witness testimony to be admitted by way of videotape, he stated:

>       "I am comfortable with this in this case *because we want to know the truth is ultimately the view of the parents.* If something along the nature of these allegations,

which are acts of sexual penetration involving children here, but my clients are 15 and 16 years old and the victims are 10 and 12 years old at the time. And I think our, at that time, attitude is we have grave doubts these things occurred.

*The boys deny they occurred, but I think the parents and I agree—I think with Mr. Lee as well—that if such acts happened, then it needs to stop. An intervention is not inappropriate by way of government to help these boys if such things happened.* You know, so. We are on the same page, and we don't want to cause trauma to anybody. But we are, we are not—*we are seeking the truth this here [sic] the same as the Court and the same as the prosecutor is our position.* And I am comfortable with proceeding by way of the video tape as opposed to requiring these young children to come into Court at this hearing." (Emphases added.)

¶ 94 Although these statements were made at the beginning of the trial, they are important because they demonstrate the defense attorney's mindset and set the tone for his representation.

¶ 95 Defense counsel's mindset is evident when he examined the boys' parents. When questioning Becky, the boys' mother, defense counsel asked her:

"Q. Be fair to say that—let me ask you this. These are your adopted kids, Ricky and Austin?

A. Yes.

Q. You love them?

A. Yes.

Q. You want the best for them?

A. Yes.

Q. These allegations cause you concern, do they not?

A. Yes.

Q. Would you participate in a coverup of such activity to try to prevent *the truth* from coming out?

A. No.

Q. You don't believe these allegations are true; is that right?

A. No.

Q. But you're concerned?

A. Yes.

Q. You can't be with your kids every minute of the day, can you?

A. No.

Q. And things can happen outside your knowledge?

A. Yes." (Emphasis added.)

¶ 96 Similarly, when examining the boys' father, Jim, counsel posed the following questions:

"Q. You love your kids as well as your wife?

A. Yes, I do.

Q. And you want what's best?

A. Pardon me?

Q. You want what's best for your kids?

A. Yes, I do.

Q. You don't approve of child sex between children, do you?

A. No.

Q. And you would want to know if there was oral or anal sex involving Ricky and Austin and either Jonathan or Dylan [*sic*] or anyone; is that right?

A. Yes.

Q. And you would accept the government's help in trying to deal with issues like that if you believed that had happened?

A. Yes, I would."

¶ 97    Finally, during closing argument, defense counsel stated:

"There is certainly some similarities to a trial and that is—but I think there are some differences here. I think I'd like to keep our attention—I believe that we all have the same ultimate goal in mind, and that is the best interests of these kids.

The parents have both testified that their values are values that prohibit this type of child sexual behavior. They are opposed to it in the strongest possible terms. If this is happening, they want it known and they want their kids to get help so it doesn't happen again. That's what they have testified to, and they deserve credibility on that."

¶ 98    Clearly, Austin's attorney made it known on more than one occasion during the delinquency trial that he shared with the court, the State, and the parents, the common goal of getting to "the truth." Austin's attorney also suggested that he believed an adjudication and the attendant consequences would be in Austin's "best interests" if, in fact, he committed the charged offenses. Although it is not unusual for a defense attorney to state that the defense is seeking "the truth," the implication is typically that "the truth" to be shown is that the defendant is innocent of the charges. Here, however, defense counsel's reference to "the truth," in context, indicates that "the truth" is that the alleged sexual abuse happened, and "*if such acts happened, then it needs to stop. An intervention is not inappropriate by way of government to help these boys if such things happened*." (Emphasis added.)

¶ 99    We also find it telling that Austin's attorney never attempted to suppress the one piece of evidence which, ultimately, was the basis for the trial court's finding of guilt—Austin's alleged statement to the police. Despite the fact that Austin's attorney elicited testimony from Sheree Foley which indicated that Austin was aggressively questioned by the Paxton police chief, he never attempted to argue that the alleged statement by Austin was involuntary. Nor did Austin's attorney attempt to show that Austin had learning disabilities and diminished mental capabilities—information that came out at sentencing—which might have made him more vulnerable to the vigorous questioning at the police station. Further, in closing argument, Austin's attorney never argued that, due to the contradictory testimony, the court should discount, or disregard altogether, Austin's alleged statement at the police station. In fact, defense counsel made no argument at all regarding this one contested point.

¶ 100    We recognize that juveniles are not entitled to a jury trial and, thus, delinquency proceedings are not the exact equivalent of an adult trial. We also agree that, as envisioned by the Juvenile Court Act, juvenile proceedings are intended to be less adversarial than criminal trials. Nevertheless, when a minor is charged with a criminal offense—particularly one which may subject him or her to a lifetime of collateral consequences—the minor is entitled to an attorney who is dedicated to providing the minor with a zealous defense, an attorney who will hold the prosecution to its burden of proof. The time for "best interests" considerations is at the disposition phase.

¶ 101    Austin contends that, in this case, the comments and conduct of his attorney throughout the delinquency proceedings are strong evidence that his attorney's concern was to do what *he* believed was in the best interests of his clients and of society and, thus, his attorney was not acting as defense counsel. We agree. Based on the facts of this case, we hold, as the appellate court did, that "[a]lthough the trial court never expressly appointed [Austin's attorney] as guardian *ad litem*, both the court and [Austin's attorney] himself conceived his role as that of a guardian *ad litem*—representing the minors' and society's best interests—rather than that of a traditional defense attorney." 403 Ill. App. 3d at 683-84. For this reason, we find that Austin's counsel labored under a *per se* conflict of interest. Accordingly, we reverse Austin's conviction and remand for a new trial.

¶ 102                    B. *Ineffective Assistance of Counsel*

¶ 103    As set forth above, Austin also raises several claims of ineffective assistance of counsel in his appeal. He contends: (1) his attorney was ineffective because he labored under a *per se* conflict of interest based on his contemporaneous representation of Ricky, an alleged victim in this case; (2) his attorney was ineffective because he labored under an actual conflict of interest based on his relationship with Austin's parents; (3) his attorney provided ineffective assistance because he never challenged the admissibility of the hearsay statements of three witnesses (the videotapes); (4) his attorney provided ineffective assistance because he waived Austin's constitutional right to confront the witnesses against him; and (5) his attorney provided ineffective assistance because he never filed a motion to suppress Austin's statement to the police.

¶ 104    We have already discussed much of counsel's complained-of conduct, finding that it is evidence that Austin's attorney was acting more as a guardian *ad litem* than as a defense attorney. Therefore, we need not consider whether the conduct supports a free-standing claim of ineffective assistance of counsel.

¶ 105                    C. *Sufficiency of the Evidence*

¶ 106    Austin's only remaining claim is that the evidence presented at his delinquency proceeding was not sufficient to prove him guilty beyond a reasonable doubt. Although we have already reversed Austin's adjudication, we must determine whether double jeopardy would prevent his retrial. See *People v. Lopez*, 229 Ill. 2d 322, 367 (2008) (retrial raises double jeopardy concerns and requires us to consider the sufficiency of the evidence).

¶ 107    In delinquency proceedings, as in criminal cases, when evaluating a challenge to the

sufficiency of evidence, the relevant question is "whether, [after] viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 47; see also *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Generally, the trier of fact has had the opportunity to hear and see the witnesses and, for that reason, is in the best position to judge credibility. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). Thus, it is not the function of a reviewing court to retry the defendant. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). Rather, a reviewing court "must allow all reasonable inferences from the record in favor of the prosecution" (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and reverse a conviction only if the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt (*People v. Collins*, 214 Ill. 2d 206, 217 (2005)).

¶ 108    In the case at bar, the trial court admittedly struggled when assessing the credibility of the three child witnesses whose testimony was received by way of videotape. Ultimately, the court ruled that Willie's testimony "lacked credibility," Jonathon's testimony was "only slightly more credible," and Dillon's testimony was "suspect." For these reasons, the court found this evidence, standing alone, was not sufficient to support a finding of guilt and acquitted Ricky. Austin, however, was alleged to have made an admission to the police. Whether the statement was actually made was a hotly contested issue at trial. Nonetheless, the court resolved that issue, ruling that the State had proved beyond a reasonable doubt that the admission was made.

¶ 109    Affording proper deference to the findings of the trial court, we cannot say that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Accordingly, we hold that the evidence was sufficient to prove Austin guilty.

¶ 110                                      III. Conclusion

¶ 111    We find that the evidence presented by the State in Austin's delinquency proceeding was sufficient to support Austin's adjudication. However, we reverse Austin's adjudication of delinquency based on our finding that, under the specific facts of this case, the legal representation Austin received at his delinquency trial was not the type of counsel guaranteed by due process and our Juvenile Court Act. Austin's attorney operated under a *per se* conflict of interest due to the fact that he functioned more as a guardian *ad litem* than as defense counsel.

¶ 112    The judgments of the circuit and appellate courts are reversed and the cause is remanded to the circuit court for further proceedings.

¶ 113    Judgments reversed.

¶ 114    Cause remanded.

¶ 115    JUSTICE FREEMAN, concurring in part and dissenting in part:

¶ 116    I agree that Austin's delinquency adjudication must be reversed, but for reasons other than those advanced in today's opinion. I find Austin's argument that the State failed to meet its burden of proof to be persuasive. As such, remand for a new trial is inappropriate.

¶ 117    Under Illinois law, proof of an offense requires proof of two distinct propositions or facts beyond a reasonable doubt: (1) that a crime occurred, *i.e.*, the *corpus delicti*; and (2) that the crime was committed by the person charged. *People v. Sargent*, 239 Ill. 2d 166, 183 (2010). It is well established that proof of the *corpus delicti* may not rest exclusively on a defendant's extrajudicial confession, admission, or other statement. *Id.*; *People v. Furby*, 138 Ill. 2d 434, 446 (1990); *People v. Lambert*, 104 Ill. 2d 375, 378 (1984). Where a defendant's confession is part of the proof of the *corpus delicti*, the prosecution must also adduce corroborating evidence independent of the defendant's own statement. *Sargent*, 239 Ill. 2d at 183. If a confession is not corroborated in this way, a conviction based on the confession cannot be sustained. *Id.*

¶ 118    "[I]f the independent evidence *tends* to prove that an offense occurred, then such evidence, if corroborative of the facts contained in the confession, may be considered along with the confession in establishing the *corpus delicti*." (Emphasis in original.) *People v. Willingham*, 89 Ill. 2d 352, 361 (1982). "In such event, the independent evidence need not establish beyond a reasonable doubt that an offense did occur." *Id.*

¶ 119    There is no requirement that the independent evidence and the details of the confession correspond in every particular. *Furby*, 138 Ill. 2d at 451. "What is necessary are facts or circumstances ' "independent of the confession, and consistent therewith, tending to confirm and strengthen the confession." ' " *Id.* at 452 (quoting *People v. Lueder*, 3 Ill. 2d 487, 489 (1954), quoting *Bergen v. People*, 17 Ill. 426, 429 (1856)).

¶ 120    Under the *corpus delicti* corroboration requirement, the State's burden, as generally framed by this court, is that the independent evidence must "tend" to show or establish that a crime did occur. The term "credible" is essentially absent from these formulations. However, a credibility component is nevertheless implicit. See *People v. Hubbard*, 38 Ill. 2d 104, 110-11 (1967) (rejecting State's argument that defendant's rape confession was sufficiently corroborated, where "the evidence supporting the confession is so weak as to defy belief"); *Furby*, 138 Ill. 2d at 452 (requiring facts or circumstances "independent of the confession, and consistent therewith, tending to confirm and strengthen the confession" (internal quotation marks omitted)). The alternative would be untenable. It makes no sense to allow incredible evidence to suffice to corroborate a defendant's admission. Evidence that is not credible cannot corroborate anything; the terms are self-contradictory.[7]

---

[7]As indicated above, a credibility component is implicit in Illinois' *corpus delicti* corroboration requirement. I note, in addition, that other jurisdictions have expressly included such a component. See *State v. Anglin*, 751 A.2d 1007, 1011 (Me. 2000) (stating there must be "such credible evidence as will create a substantial belief that the crime charged has been committed by some person"); *State v. Puckett*, 2010-Ohio-6597, ¶ 15, 947 N.E.2d 730 (Ct. App.) (stating record must contain "some competent and credible evidence independent of the defendant's confession to

-28-

¶ 121    Here, the circuit court, the finder of fact in this case, found the testimony of the minors not to be credible. There is nothing in the record which would cause me to doubt this finding, which was also noted by the dissenting justice below (403 Ill. App. 3d 667, 687 (Appleton, J., dissenting)). As a result of this finding, the determination of Austin's guilt "then had to be decided on the evidence of his interview with the DCFS investigator and the Paxton police." *Id*. But convicting a defendant solely on the basis of a confession directly contradicts the *corpus delicti* corroboration requirement. See *Sargent*, 239 Ill. 2d at 183; Julian S. Millstein, Note, *Confession Corroboration in New York: A Replacement for the Corpus Delicti Rule*, 46 Fordham L. Rev. 1205 (1978). If a naked confession is not corroborated pursuant to this requirement, a conviction based on the confession cannot be sustained. *Sargent*, 239 Ill. 2d at 183; see *Lueder*, 3 Ill. 2d at 488 (citing *Bergen*, 17 Ill. at 428-29).

¶ 122    In light of the above, Austin's conviction must be reversed because the State did not satisfy its burden of proof. I would therefore reverse the delinquency adjudication outright.

¶ 123    JUSTICE KARMEIER, concurring in part and dissenting in part:

¶ 124    I write separately to express my agreement with Justice Freeman's separate opinion and with a portion of Justice Thomas' dissent.

¶ 125    With respect to the latter, I believe Justice Thomas persuasively demonstrates that trial counsel understood his proper role in this delinquency proceeding and functioned accordingly. Thus, there was no *per se* conflict of interest. As Justice Thomas notes, "the State had it exactly right when it argued that, 'a best-interest-oriented defense counsel is not the same thing as a GAL, as counsel's loyalties lay firmly and solely with his juvenile client.' " *Infra* ¶ 158 (Thomas, J., dissenting). I disagree with the majority's conclusion, and basis for reversal, *i.e.*, that "Austin's attorney operated under a *per se* conflict of interest due to the fact that he functioned more as a guardian *ad litem* than as defense counsel." *Supra* ¶ 111.

¶ 126    Notwithstanding, I, like Justice Freeman, believe that there must be *credible* evidence to corroborate Austin's alleged one-sentence confession, the existence of which was itself a matter of dispute at trial. As one appellate panel recently put it, the State's independent evidence should "inspire belief in the defendant's confession." *People v. Rivera*, 2011 IL App (2d) 091060, ¶ 41. The quality of the State's "corroborative" evidence in this case fails in that regard—some of it can be dismissed out of hand as sheer fantasy. The trial court concluded that Willie's testimony "lacked credibility," Jonathon's was "only slightly more credible," and Dillon's was "also suspect." What is "slightly more credible" than incredible? Is "suspect" synonymous with "credible"? As Justice Freeman aptly observes, "[e]vidence that is not credible cannot corroborate anything." *Supra* ¶ 126 (Freeman, J., concurring in part and dissenting in part). Here, we have, *on the record*, the circuit court's own assessment of the witnesses. The circuit court never found the testimony of the minors to be credible. Moreover, we have stated that "the corroboration rule requires that there be independent evidence tending to show that defendant committed each of the offenses for which he was

establish that a crime occurred"). I would make this court's implicit credibility component explicit.

-29-

convicted." *People v. Sargent*, 239 Ill. 2d 166, 185 (2010). The circuit court, after hearing these children testify, was only willing to say that "something probably happened." That does not appear to reflect the degree of specificity required by our jurisprudence. I agree with Justice Freeman's analysis and conclusion. Austin's delinquency adjudication should be reversed outright.

¶ 127    JUSTICE THOMAS, dissenting:

¶ 128    Today, for the first time, the Illinois Supreme Court holds that the proper way for an appellate court to proceed on review is to first adjudicate the merits of an issue and next to determine if the case even presents that issue. I cannot agree with my colleagues' decision to depart from basic appellate procedure, nor do I agree with their conclusion that this case presents the issue that they have decided to adjudicate. The record is unmistakably clear that attorney Novak did not serve as a GAL. Rather, he functioned solely as a defense attorney—and a remarkably effective one at that. This case presents *no* issue of hybrid representation, and the majority has issued an advisory opinion on a set of facts not before the court. In doing so, my colleagues unfairly demean what was, in truth, a fine performance by attorney Novak, and their conclusion that Austin was denied his right to counsel is completely unfounded and finds no support in the record. Moreover, despite the court's pronouncement that its reversal is "based on *** the specific facts of this case" (*supra* ¶ 111), there can be doubt just how broad the court's holding actually is: no matter how well a minor's defense attorney performs in a delinquency proceeding, the minor is entitled to a new trial if he can point to any evidence in the record that his counsel had a best interests "mindset" (*supra* ¶ 94). There is no justification for such a holding, and I therefore must dissent.

¶ 129                    I. The Majority Opinion Is Written Backwards

¶ 130    The majority puts the cart before the horse when, before determining whether this case even involves hybrid representation, it addresses the issue of whether a *per se* conflict of interest arises when an attorney serves both as GAL and defense counsel. This is clearly backwards. It makes no sense to determine if hybrid representation is permissible before determining if this case even involves hybrid representation. The appellate court addressed the issues in the proper order. First, the appellate court properly noted that whether Novak served as both GAL and defense attorney was a "threshold" issue. After it concluded (incorrectly) that he did serve in both capacities, it then moved on to consider whether such representation was permissible. 403 Ill. App. 3d at 683-84.

¶ 131    If this were just a matter of style, I would be inclined to let it go. This is much more important than mere style, however, as courts must be constrained by the facts before them. If it were otherwise, a court could decide whatever it wanted at any time, and advisory opinions would be rampant. Let us consider the following two self-evident propositions:

> (1) The case in which it is appropriate to determine whether a defense attorney may serve as both defense attorney and GAL is one in which the attorney served as both defense attorney and GAL.

(2) If the case before the court does not involve an attorney who served as both GAL and defense attorney, then that case is an inappropriate vehicle in which to determine if the same attorney may fill both roles.

Is there anything controversial about the above two statements? Is it even possible to quarrel with either? If we accept the truth of the above two statements, as we must, then it is obvious that the court must first determine if this case involves hybrid representation before adjudicating the merits of the conflict of interest issue.

¶ 132    Demonstrating the error of the majority's ways is a simple exercise. First, let us assume that the court first addresses whether hybrid representation occurred in this case before determining whether such representation was permissible. One of two things would happen. If the court determines that there was *no* hybrid representation, then it will decline to address the conflict issue as not properly before the court. Indeed, this court explained in *People ex rel. Partee v. Murphy*, 133 Ill. 2d 402, 409 (1990), that it will not reach the merits of a conflict of interest question if the facts do not support finding such a conflict because that would mean that the issue is "not ripe" and that any opinion on the issue would be "purely advisory." Alternatively, if the court determines that there *was* hybrid representation, then it would go on and address whether such representation is permissible. In neither instance would the court end up with an advisory opinion.

¶ 133    Now let us look at what happens with the majority's preferred approach. If you first determine that a *per se* conflict of interest arises when an attorney functions as both defense attorney and GAL, and then determine—as the majority incorrectly does here—that hybrid representation occurred, there is no problem. But, if you first determine that hybrid representation is impermissible, but then determine that the case before the court does not involve hybrid representation, you are left with a purely advisory opinion. An approach that inevitably leads to advisory opinions cannot be correct. So, while the majority's approach ultimately does not create a problem in this particular case, advisory opinions will inevitably follow in the future if this is how this court wants reviewing courts to proceed. Moreover, no one ever wants to conclude that all of their work has been a colossal waste of time, so determining that the issue is properly before the court should *always* be done before the issue is adjudicated.

¶ 134    Again, this is not just a matter of style, as this court clearly explained in *Partee*. In that case, the issue was whether it was a conflict of interest for the State's Attorney to represent both the county clerk and the county treasurer, in their official capacities, in a tax indemnity proceeding. *Partee*, 133 Ill. 2d at 404. This court, in a unanimous opinion, explained why it would not be proper to answer this question unless the State's Attorney was currently representing both parties:

"Next, on the issue of whether dual representation is allowed in a tax indemnity proceeding, we believe that in resolving that question we would be rendering an advisory opinion. Our jurisdiction is restricted to cases which present an actual controversy, and we decline to issue advisory opinions on moot or abstract questions of law. (*People ex rel. Black v. Dukes* (1983), 96 Ill. 2d 273, 276; *In re Marriage of Wright* (1982), 89 Ill. 2d 498, 500; *Underground Contractors Association v. City of*

-31-

*Chicago* (1977), 66 Ill. 2d 371, 375.) An advisory opinion results if the court resolves a question of law which is not presented by the facts of the case. (See *Slack v. City of Salem* (1964), 31 Ill. 2d 174, 178 (court vacated trial court's resolution of a 'hypothetical' constitutional issue).) If it is apparent that an opinion cannot affect the result as to the parties or controversy before it, the court should not resolve the question merely for the sake of setting a precedent to govern potential future cases." *Id.* at 407-08.

The court agreed with the State's Attorney's contention that the clerk was not currently a party to the suit and that the State's Attorney was thus not currently representing the clerk. The court noted that the clerk may be made a party in the future and that, at that time, the State's Attorney might be called upon to represent the clerk. However, because those facts did not currently exist, the question of whether an impermissible conflict would be created was not ripe for discussion. *Id.* at 409. The *Partee* approach was obviously correct. *Partee* would have come out the other way if the majority's approach were followed. The court would have simply issued an advisory opinion on an issue for no other reason than that the appellant put the argument in its brief. One would hate to see the majority's framework become standard procedure in the appellate court, but what choice will the appellate court have? Even in the face of this dissent, the majority has failed to offer a single justification for departing from standard appellate procedure.

¶ 135                    II. There Was No Hybrid Representation in This Case

¶ 136                              A. *Statement of Facts*

¶ 137    Before I turn to the heart of this dissent, which will explain why the majority is unquestionably incorrect in asserting that Novak operated under a *per se* conflict of interest, I must take issue with the manner in which the majority sets forth the facts of this case. In another departure from standard opinion writing, the majority does something that I have never seen this court do before. Although it provides a narrative statement of facts, it occasionally switches to a Q and A format for the sole purpose of sprinkling in critiques of Novak's trial strategy that are not being raised by the parties. For instance, the majority periodically criticizes Novak for failing to object. In one instance, the majority implies that Novak did not object to leading questions (which are not set forth) (*supra* ¶ 18 n.3), but, typically, the majority does not even state what the objection should have been. In another instance, the majority criticizes Novak for objecting a few questions too late (even though his objection was overruled). *Supra* ¶ 14. When to object, of course, is solely a matter of trial strategy, and this court's previous position had always been that it will not second-guess matters of trial strategy, even when being asked to adjudicate an ineffective assistance of counsel claim. *People v. Manning*, 241 Ill. 2d 319, 333-34 (2011). Now, apparently, the court will not only second-guess trial strategy, it will even do so in the *statement of facts*. The majority frequently does not state what the objection should have been, or why it believes the objection would have been successful, so it is difficult to even craft a response to its critiques.

¶ 138    Further, Austin has raised no issue whatsoever about the manner in which Novak

examined witnesses and has not raised a single instance in which he believed that Novak should have objected. This is not part of Austin's *per se* conflict of interest argument, nor is it part of his ineffective assistance of counsel argument. Moreover, it is not even part of the majority's analysis. When the majority sets forth its reasons for reversing, it makes no mention of Novak not objecting often enough.[8] If Austin is raising no issue about the frequency of Novak's objections, and that plays no part in the majority's analysis, then why is the majority sprinkling these critiques throughout its statement of facts? It seems that the *only* purpose this serves is to prejudice the reader against Novak before the reader gets to the court's analysis. A different conclusion might be possible if the court also highlighted examples of the prosecutor failing to object or noted the many instances of effective lawyering by Novak. Failing that, what possible conclusion is there other than that the court wants to paint Novak in as negative a light as possible?

¶ 139 Most of the majority's critiques of Novak are baseless, anyway. First, it goes without saying that a judge could take the transcript in *any* criminal case and, with all the time in the world and not in the heat of trial, find instances in which an attorney could have objected, could have objected earlier, or let a leading question go by. Since when has that ever meant that an attorney is not functioning as defense counsel? It is a cardinal rule that courts should not, with the benefit of hindsight, second-guess the strategic decisions of defense counsel. *People v. Jacobazzi*, 398 Ill. App. 3d 890, 922 (2009). Moreover, this was not a jury trial in which there is a danger that the trier of fact will be improperly swayed. Rather, it was a bench trial, at which the judge is presumed to consider only relevant, competent testimony. *People v. Kerwin*, 159 Ill. 2d 436, 446 (1994).

¶ 140 Let us now look more closely at a few of the majority's complaints. The majority complains that Novak did not object soon enough when the prosecutor was asking Becky a number of questions about Austin's alleged admission at the police station. The majority suggests that these questions were improper because Becky said that she had not been present. *Supra* ¶ 39. However, the majority immediately demonstrates the error of its own statement by setting forth questions from the transcript showing that the prosecutor was *not* asking Becky any questions that would have required her personal knowledge about the incident. Rather, he was asking her about her own review of the police report and conversations that she had with her husband and Austin about the incident. Novak objected to this line of questioning on hearsay grounds, but the court *overruled* his objection. The majority suggests that Novak could have objected a few questions earlier, but what difference would that have made? What is the majority suggesting here, that if Novak would have had an objection overruled a few questions earlier he would have been a defense attorney, but since he waited a few questions too long he was a GAL? And, if that is not what the majority is suggesting, then why include this criticism at all? Further, not only did the trial court

---

[8]If the majority did rely on this, it would be wholly improper, as Austin has made no such argument. In *People v. Givens*, 237 Ill. 2d 311, 323-25 (2010), this court very clearly said that it would not search the record for unargued or unbriefed reasons to reverse a trial court's judgment. Doing so would have the effect of transforming this court's role from that of jurist to that of advocate. *Id.* at 324.

overrule Novak's objection, but the testimony that came out was actually helpful to Austin. All that the prosecutor's questions accomplished were to once again allow Becky to say both that the police were being nasty and calling Austin a liar and that Austin denied confessing.

¶ 141    Surely the majority knows that just because an attorney *can* object does not mean that an attorney *should* object. Often cross-examination accomplishes nothing more than allowing the witness to go over his or her testimony again, further burning it into the brain of the trier of fact. Clearly it is proper strategy for an attorney to forgo objections that he could make if he believes that the testimony is helping his side. Here, the answers Becky was giving were helpful to the defense, so there is no justification for the majority's criticisms of Novak.[9] Is it now the position of the Illinois Supreme Court that an attorney should make every objection that the law allows, even when the testimony coming from the stand is helpful to that party's case? And does the court feel so strongly about this that it is worth interrupting its statement of facts to point it out?

¶ 142    The majority immediately follows the above critique by once again criticizing Novak for failing to object to testimony that was helpful to his case. The majority sets forth several pages of transcript in which the prosecutor was questioning Becky about previous statements that she made that she believed that Jonathan and Dillon had been abused before being placed in her home. *Supra* ¶¶ 41-44. She confirmed to the prosecution that she had this belief and that she felt that it was important that DCFS be made aware of the information. The prosecutor then attempted to determine whether she had any similar knowledge with respect to Willie. As the majority notes, the trial judge eventually suggested that the prosecutor move along. This in no way means, however, that Novak should have been objecting. Obviously, the defense was hoping to convey that the sexual knowledge and allegations of the victims were based on experiences that they had *before* being placed in Jim and Becky's home. Indeed, Austin is relying on that very point to try to obtain a reversal of his conviction. In his reasonable doubt argument, Austin argues that Dillion's claims "were far from spontaneous, *and he had a source of precocious sexual knowledge wholly unrelated to his time at the M's*." (Emphasis added.) Becky's answers on cross-examination were supportive of this point, and the prosecutor failed to dislodge her from her statements. But, apparently, the only proper strategy for Novak to employ would have been to object to questions that were eliciting testimony helpful to his side.

¶ 143    The majority also seems to find fault with Novak for conceding in his closing argument that this was a "tough case" (after editorializing that the prosecutor's argument was "forceful" but that Novak's was not). *Supra* ¶¶ 52, 56. But, Novak needed to have credibility in his closing argument. What was he supposed to say, that a case in which three witnesses are accusing your client of sexual abuse and two witnesses are saying that your client confessed to the crime is a slam dunk for acquittal? How would that have gone over with the trial court?

¶ 144    I truly regret having to divert the focus of this dissent from the important legal issues

---

[9]As we will see, this is just one example out of many of either Austin or the majority criticizing Novak for proper and effective lawyering.

before the court. The above discussion is necessary only because the majority has chosen not to simply set forth a narrative statement of the facts relevant to the issues before the court. It is unfortunate that a majority of this court believes that it is appropriate in a statement of facts to second-guess an attorney's trial strategy on matters not being raised by the parties.

¶ 145                    B. *Novak Was Not a GAL*

¶ 146    On most issues that come before the court, a reasonable argument can be made on both sides, and there is legitimate room for disagreement. Whether Novak served as a GAL in this case is not one of those issues. The *only* legitimate conclusion that can be drawn from the record is that Novak served only as a defense attorney. As the majority concedes, a GAL is appointed *by the court*. See 705 ILCS 405/2-17(1), (3) (West 2010). In a delinquency proceeding, a GAL is appointed only if the court makes one of two statutory findings: (1) there may be a conflict of interest between the minor and his parents or other custodian; or (2) it is otherwise in the minor's best interests that a GAL be appointed. 705 ILCS 405/2-17(3) (West 2010). The majority claims that it makes its determination of whether Novak functioned as a GAL by "turn[ing] to the record" (*supra* ¶ 87), but unless the majority can point to the page in the record where the trial court made the requisite statutory finding and appointed Novak a GAL, the discussion should end here. The record clearly shows that Novak was hired by Austin and Ricky's parents to defend the misdemeanor allegations against Austin and Ricky, and he was never appointed as a GAL. Nor did either the appellate court or the majority cite any authority for the proposition that an attorney can imagine himself into the role of a GAL or become one in any other way besides a court appointment.

¶ 147              C. *There Was No Per Se Conflict of Interest*

¶ 148    Once we accept the obvious truth that Novak did not serve as GAL in this case, we can stop talking about *per se* conflicts of interest. As this court has clearly explained, and as the majority acknowledges, a *per se* conflict of interest exists where "certain facts about a defense attorney's *status* engender, by themselves, a disabling conflict." (Emphasis added.) *People v. Taylor*, 237 Ill. 2d 356, 374 (2010); *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008). In other words: "[w]hen a defendant's attorney has a tie to a person or entity that would benefit from an unfavorable verdict for the defendant, a *per se* conflict arises." *Hernandez*, 231 Ill. 2d at 142; *People v. Janes*, 168 Ill. 2d 382, 387 (1995); *People v. Spreitzer*, 123 Ill. 2d 1, 16 (1988). Or, as the appellate court has explained, *per se* conflicts exist where defense counsel has professional commitments to others clearly antagonistic to the interests of the accused. *People v. Claybourn*, 221 Ill. App. 3d 1071, 1080 (1991).

¶ 149    Applying the above law, how can there possibly be a *per se* conflict of interest in this case if Novak was never appointed GAL? As we have clearly explained, facts about the attorney's *status*, all by themselves, create *per se* conflicts of interest. Here, Novak's only *status* was that of a defense attorney, hired by Austin's parents, to represent Austin in a delinquency proceeding. Novak did not have a tie to any person or entity who would have benefitted from an unfavorable verdict for Austin (see *Hernandez*, 231 Ill. 2d at 142); nor did he have professional commitments to people who had interests antagonistic to Austin's (see

-35-

*Claybourn*, 221 Ill. App. 3d at 1080). Novak's sole professional commitment was to Austin and his brother, and, as Novak himself explained on the record, he had a duty to no one but Austin and his brother.

¶ 150    This court has previously rejected a defendant's attempt to rely on the *per se* conflict of interest rule when the requisite status was not present. In *People v. Morales*, 209 Ill. 2d 340 (2004), the defense attorney also represented a person, Hernandez, who was a potential witness against the defendant. Moreover, some of Hernandez's out-of-court statements about the defendant were admitted into evidence at the defendant's sentencing. We rejected the defendant's claim that this was a *per se* conflict of interest because, "the fact remain[ed] that [Hernandez] was never a witness. Thus defense counsel never assumed the status of attorney for a prosecution witness." *Id.* at 346. The exact same analysis should be applied here. The fact remains that the court never appointed Novak a GAL, and thus he never assumed the status of a GAL.

¶ 151    The State quite sensibly responded to Austin's wholly improper request that this court issue an advisory opinion on a set of facts not before the court by pointing out that "[t]he question is not whether Novak improperly assumed two conflicting roles, but whether he fulfilled his one and only role—that of defense counsel—appropriately." The State notes that, even if Novak misperceived his role, that clearly does not transform this into a *per se* conflict case: "[r]egardless of how respondent's counsel perceived his role, it is illogical to claim that counsel was conflicted in executing two different roles when he was not assigned both roles." Thus, the State had it exactly right when it stated that, "[r]espondent's arguments directed to the propriety of hybrid representation therefore invite the Court to engage in a purely hypothetical exercise."

¶ 152    The majority does not respond to the State's argument on this point, but, clearly, the State is correct. Assume for the sake of argument that a defense attorney in a delinquency proceeding misperceives his role as more like that of a GAL. Which of these questions better describes the issue facing the court: (1) Did the attorney misunderstand the role of a defense attorney in a delinquency proceeding, and, if so, did that misperception prejudice the defendant? or (2) Did the attorney misunderstand the role of a defense attorney in a delinquency proceeding, and, if so, did this misperception transform the attorney into a GAL, such that a *per se* conflict of interest arose? Is it not obvious that it is the former? How can an attorney's misperception of the role of a defense attorney in a delinquency proceeding give the attorney the *status* of a GAL, which is a position that requires a court appointment? And, if the attorney does not have the status of a GAL, then there is no hybrid representation and no *per se* conflict of interest. By eliminating the status component of the *per se* conflict of interest rule, the majority has seriously undermined that entire body of case law and opened the door to the possibility that the courts will begin to find *per se* conflicts based on nothing other than an attorney's "mindset" (*supra* ¶ 94). Is the "mindset" holding relevant only in this context, or can it be applied in any *per se* conflict of interest situation? If there is any limiting principle on this holding, the majority should say what it is.

¶ 153                    D. *Novak Functioned Solely As a Defense Attorney*

¶ 154        As I stated above, I reject out of hand the notion that a *per se* conflict of interest between an attorney's duties as GAL and defense attorney can arise in a case in which the attorney was not a GAL. Assuming the majority's position for the sake of argument, however, Austin *still* is not entitled to relief because the record is unmistakably clear that Novak functioned solely as a defense attorney. We got to the point we are at today—with Austin requesting an advisory opinion on an issue not before the court and multiple entities joining in an *amicus curiae* brief on an issue not before the court—as a result of a surprisingly brief analysis by the appellate court. This is the *entirety* of the appellate court's analysis on this point:

> "Although the trial court never expressly appointed Novak as guardian *ad litem*, both the court and Novak himself conceived his role as that of a guardian *ad litem*—representing the minors' and society's best interests[10]—rather than that of a traditional defense attorney. Accordingly, we treat the issues raised by respondent as though the trial court formally appointed Novak as guardian *ad litem*." 403 Ill. App. 3d at 683-84.

In other words, the appellate court was not the slightest bit concerned with looking at how Novak actually performed in this case. All that the appellate court needed to look at was the trial court's comment and the brief speech that Novak gave before the start of the adjudicatory hearing. The appellate court apparently believed that these comments show that Novak so fundamentally misunderstood the proper role of a defense attorney in a delinquency proceeding that he, essentially, at that moment, became the exact equivalent of a GAL, such that the court needed to determine whether a disabling *per se* conflict of interest arose.[11]

¶ 155        The majority's position is somewhat more reasonable. The majority identifies the issue not so much as how Novak *conceived* his role, but as how he actually *functioned* during the proceeding. The majority notes that Austin argued that he was deprived of his constitutional right to counsel in his defense because Novak "*performed* less as a defense attorney and more as a guardian *ad litem*." (Emphasis added.) *Supra* ¶ 63. The majority states that, "[w]e must still consider whether it is constitutionally and statutorily permissible for a single attorney to *function as both defense counsel and GAL* when representing a minor in a delinquency proceeding" (emphasis added) (*supra* ¶ 65) and later concludes that, while Novak was not actually appointed as GAL, he "*functioned* [as one] in the case at bar" (emphasis added) (*supra* ¶ 87). Further, the majority acknowledges that the problem arises only when counsel "*attempts to perform the role of GAL* as well as defense counsel" (emphasis added) (*supra*

---

[10]Neither the trial court nor Novak said that Novak was representing society's best interests.

[11]In one sense, however, the appellate court's error is more understandable than the majority's because the appellate court did not acknowledge or discuss the status component of the *per se* conflict of interest rule. The appellate court also did not find that a *per se* conflict of interest existed, so it might have failed to appreciate the disruption to the law that would occur by ignoring the status component. By contrast, the majority *does* recognize the status requirement (*supra* ¶ 80), but then inexplicably fails to enforce it.

¶ 84), and thus concludes that it needs to make a "*realistic appraisal* of defense counsel's *professional relationship* to someone other than the defendant" (emphases added) (internal quotation marks omitted) (*supra* ¶ 83).

¶ 156    Unfortunately, however, once it moves onto the analysis, the majority does not do any of the things it promised to do. As did the appellate court, the majority focuses almost exclusively on the speech that Novak gave before the hearing even started. The majority does not consider how Novak functioned during the proceeding, does not cite examples of him attempting to perform the role of GAL, and does not make a realistic appraisal of his professional relationships to other persons. Instead, the majority changes the focus entirely and claims that it is reversing *not* based on how Novak functioned at trial but rather on Novak's "mindset" prior to trial and the "tone" of his representation. *Supra* ¶ 94. The majority does not explain the disconnect between the law it sets forth and the law it applies. Except for the trial court's statement and Novak's brief speech, the *only* things that the majority points to in trying to make the case that Novak functioned as a GAL rather than as a defense attorney are: (1) Novak's failure to file a motion to suppress that would have had no chance of succeeding (*supra* ¶ 99); and (2) Novak's pursuing of a line of questioning that allowed him to make a more effective closing argument.

¶ 157    In making its case that Novak functioned as a GAL rather than as a defense attorney, the majority relies on four things: (1) the trial court's statement to Austin's parents that Novak represented what was in the best interests of Austin and Ricky and that this may or not be what the minors or their parents thought was in the minors' best interests; (2) the brief speech that Novak gave before the adjudicatory hearing began; (3) Novak's failure to file a motion to suppress Austin's statement to the police; and (4) Novak eliciting testimony from Austin's parents that they were opposed to child sexual abuse and that they would accept the government's help in dealing with it if they believed that it happened, and then relying on this point in closing argument. After explaining why these things did not make Novak the functional equivalent of a GAL, I will do what the majority promised, but failed, to do—consider how Novak actually functioned in the proceeding and make a realistic appraisal of Novak's professional relationship to people other than Austin.

¶ 158    As for the trial court's statement, I find it largely irrelevant. No matter what the trial court thought Novak's role should be, as long as Novak functioned as a defense attorney for Austin, then Austin could not have suffered any prejudice from the trial court's statement. Again, as even the majority concedes, the proper focus here is on how Novak *functioned* in the case. Moreover, the trial court's description of what it viewed Novak's role to be was *not*, as the majority claims, "the classic description of a guardian *ad litem*" (*supra* ¶ 90). Indeed, the classic description of a GAL is given in the majority's own opinion, where the majority explains that, " '[a] guardian *ad litem* functions as the "eyes and ears of the court" and not as the ward's attorney.' " *Supra* ¶ 69 (quoting *In re Mark W.*, 228 Ill. 2d 365, 374 (2008)). The courts have also held that a GAL has a duty to consider society's interests as well as the minor's. See *In re B.K.*, 358 Ill. App. 3d 1166, 1171 (2005); *In re R.D.*, 148 Ill. App. 3d 381, 387 (1986). Thus, although the court stated that Novak would represent the best interests of the minors, the State had it exactly right when it argued that, "a best-interest-oriented defense counsel is not the same thing as a GAL, as counsel's loyalties lay firmly and solely with his

-38-

juvenile client." And that is exactly where Novak's loyalties were. Novak stated that,"I have duty to these two boys, nobody else." So, even if the court erred in stating that Novak represented the minors' best interests, that in no way made Novak the equivalent of a GAL.

¶ 159    We can now turn to Novak's statement to the court that was the entire basis for the appellate court's conclusion that Novak was the functional equivalent of a GAL and almost the entire basis for the majority's same conclusion. The majority focuses largely on the fact that Novak stated that he, like the State, the court, and Austin's parents, was seeking the truth in this matter. To say the least, I find it very interesting that both Austin and the majority seem to equate the word "truth" with Austin's guilt. A defense attorney saying that he is seeking the truth could not be more common.[12] This does not mean that he is aligning himself with the State. Truth is not the special province of the prosecution.

¶ 160    Notably, although Novak stated that everyone shared the goal of seeking the truth, he never even hinted that he and the State had the same view of the truth, and his entire defense case was built around trying to disprove the prosecution's case. Novak stated that the boys had consistently denied the allegations, that it was a contested hearing, that the defense disputed the prosecution's claim that Austin confessed, and that he had "grave doubts" that the abuse occurred. Novak called two of Austin's siblings and both of Austin's parents to the stand to testify that they either did not see any sexual activity or that they did not believe any sexual activity had occurred. When Austin's father testified, Novak elicited testimony that Austin had not confessed any acts to the police. In his closing argument, Novak argued that the State had not proved his clients' guilt beyond a reasonable doubt. Novak argued that the accusers had contradicted themselves, that they lacked credibility, and that their statements were not worthy of belief. Clearly, the "truth" that Novak was trying to establish was that the acts did not occur. The majority claims that "in context" the word truth refers only to Austin's guilt. *Supra* ¶ 98. If an entire defense case built around showing that the abuse did not happen is not "context" then I do not know what is.

¶ 161    The majority also objects to Novak: (1) stating that Austin's parents' objective was to learn the truth; and (2) eliciting testimony that the parents objected to child sexual behavior and would want to put a stop to it if it was happening.[13] This is yet another example of the majority criticizing Novak for effective lawyering. As the majority's own opinion demonstrates (*supra* ¶¶ 53-55), Novak used these points to try to win an acquittal for Austin. In his closing argument, Novak argued that, because Austin's parents were opposed to child sexual behavior "in the strongest possible terms," and that they wanted to know if it was

---

[12]In Johnnie Cochran's opening statement in the O.J. Simpson trial, he stated that "we are now embarked upon a search for justice, *this search for truth*, this search for the facts," and "[y]ou have this rare opportunity, it seems to me, to be participants in this search for justice *and for truth*" (Emphases added.) http://articles.latimes.com/1995-01-26/news/mn-24705 _1_opening-statement.

[13]Austin does not rely on Novak eliciting this testimony, nor does he make any argument with respect to Novak's closing argument. Again, in *Givens*, this court unanimously held that it is not appropriate for a reviewing court to search the record for unargued and unbriefed reasons to reverse a trial court's judgment. *Givens*, 237 Ill. 2d at 323. It is not clear what has changed.

happening so that they could put a stop to it, the judge should find them credible when they testified that they questioned Austin and Ricky and did not believe that the events had happened. Clearly, the parents believed that the truth was that Austin and Ricky were innocent, and Novak specifically argued that, because they were the type of people who would put a stop to these acts if they were happening, the judge should be persuaded by the fact the parents questioned Austin and Ricky over and over again and did not believe that any abuse had occurred.

¶ 162    Novak was in a tough position, having to argue that the court should find Austin's parents credible. Obviously, the trier of fact will know that parents are biased in favor of their children. Novak had to do something to boost the parents' credibility. What else could he have done? Does the majority believe that Novak would have been more effective simply arguing, "they're his parents; take their word for it"? The testimony that Novak elicited in no way harmed Austin; its *only* effect was to allow Novak to make a more effective closing argument. Does the majority honestly believe that Novak's intention was anything other than this? Again, not even Austin argued that this wholly proper defense strategy meant that Novak was acting as a GAL. Once Novak's statement prior to trial, and Novak's questioning of Austin's parents, are put in their proper context, it is clear that saying that the parents "want[ed] to know the truth" in no way made Novak the functional equivalent of a GAL.

¶ 163    The majority also finds fault with Novak for saying that he believed the acts needed to stop if they had happened and that "[a]n intervention is not inappropriate by way of government to help these boys if such things happened." *Of course* Novak believed that the child molestation should stop if it was occurring. He did not check his fundamental human decency at the door when he agreed to represent Austin and Ricky, and this statement in no way meant that he was not going to provide them with a proper defense. As for Novak's belief that an intervention by way of government was appropriate to help the boys if the acts had occurred, how does that mean that Novak was not functioning as a defense attorney? A lawyer's job as advocate is to "zealously assert[ ] the client's position under the rules of the adversary system." Illinois Rules of Professional Conduct of 2010, Preamble: A Lawyer's Responsibilities ¶ 2. There is no requirement that a defense attorney have the mindset that state action is not appropriate if his client committed the crime. Surely the majority does not believe that attorneys who represent people such as Richard Speck or John Wayne Gacy go into trial with the belief that, even if their clients committed the crime, they deserve no punishment. Here, it does not matter at all that Novak believed that a government intervention was appropriate if the boys committed the crime if Novak did his job of zealously asserting his clients' position under the rules of the adversary system. His clients' position was that they did not do the acts alleged, and Novak zealously asserted that position. His entire defense case was built around showing that the acts did not happen, and he argued to the court that the State had not established guilt beyond a reasonable doubt. The majority notes that Austin argued that he was entitled to an attorney who: (1) gave him his undivided loyalty; (2) zealously safeguarded his rights and confidences; and (3) acted in accordance with his client's wishes. *Supra* ¶ 63. Where is there any evidence that Novak failed to do these things?

¶ 164    The majority also complains that, when Novak was explaining why he was representing

-40-

both Austin and Ricky, when he might not do so in an adult case, Novak stated that, "I don't view such a proceeding as adversarial as it might be if it were an adult case." See *supra* ¶ 92. But the majority *agrees* with Novak. The majority specifically states that, "a delinquency trial is not as adversarial as a criminal trial." *Supra* ¶ 86. Clearly, then, there is nothing in Novak's statement that rendered him the functional equivalent of a GAL, or that in any way meant that he was not going to fulfill his role as defense counsel.

¶ 165   The only other thing that the majority points to in trying to make the case that Novak functioned as a GAL rather than as a defense counsel is that Novak never attempted to suppress Austin's statement to the police. Notably, however, the majority refuses to say whether it believes that such a motion would have had any chance of succeeding. And, if the motion had no chance of success, then it is illogical to claim that Novak was not functioning as defense counsel by failing to file it.

¶ 166   The appellate court concluded that such a motion likely would not have succeeded. 403 Ill. App. 3d at 682-83. The appellate court pointed out that in *In re G.O.*, 191 Ill. 2d 37 (2000), this court upheld a 13-year-old juvenile's confession as voluntary when he was interrogated by the police, alone, at 3:30 a.m. The juvenile had been in custody for several hours before the questioning commenced. This court held that the relevant factors to consider are the respondent's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of the questioning, the legality and duration of the detention, the duration of the questioning, and any physical or mental abuse by the police, including the existence of threats or promises. *Id.* at 54. The court also held that, when a juvenile's confession is involved, a significant factor to consider is whether the juvenile had an opportunity to confer with an adult concerned with his welfare. *Id.* at 55. The *G.O.* court held that the factors supported finding G.O.'s confession voluntary, even though he did not have a concerned adult with him. *Id.* at 56-57.

¶ 167   The appellate court noted that the circumstances here are less extreme than in *G.O.* Austin is three years older than G.O. was, he arrived at the Paxton police station voluntarily, and he was questioned in the presence of his father. 403 Ill. App. 3d at 683. The majority argues that Novak could have brought out the fact that Austin had a learning disability. However, there is no indication that Austin had any trouble understanding the police's questions, and he had his father by his side the whole time. Even had this fact been brought out, the factors would still clearly weigh in favor of finding the admission voluntary. Moreover, we know for a fact that the trial court would have denied the motion. When Austin's subsequent attorney argued that Novak had been ineffective for failing to move to suppress the statement, the trial court rejected the argument out of hand:

> "With respect to the Motion to Suppress, I believe, the State's comments are correct. This was not a custodial interrogation. The Respondent Minor's father was there, and the testimony was quite clear that the interview was terminated in mid-sentence or in the middle of the interview by the father at the point that the Minor was admitting in [*sic*] some misconduct, as alleged in this case. So, I don't know how it is ineffective [not] to file a Motion to Suppress under those circumstances. It was not a custodial interrogation, and, in fact, the Minor and his father terminated the questioning in mid-sentence practically."

The State argued in the trial court that, "it is not ineffective assistance of counsel to choose not to file a motion which had no merit and no hope of success." I would add that failing to file such a motion also does not mean that an attorney was not functioning as defense counsel in the case. Throughout its opinion, the majority refuses to give Novak the benefit of the doubt about anything, and everything he did is portrayed in the worst possible light. From the majority's perspective, it cannot be that, as a veteran criminal defense attorney of 30 years' experience, Novak knew that such a motion had no chance of success. Rather, it *had* to be that he was functioning as a GAL instead of as a defense attorney.

¶ 168    Moreover, the defense's position in this case was that Austin did not confess and therefore there was no statement to suppress. While the law does allow someone to move to suppress a statement that he denies making (see *People v. Norfleet*, 29 Ill. 2d 287, 289-91 (1963)), surely the majority can appreciate the practical difficulty, from a credibility standpoint, of first arguing that your client confessed only because of overbearing police conduct, and then presenting a case to that same judge that your client never confessed. Here, it is entirely possible that Novak knew that the motion had no chance of success and that there was no point in pursuing it, especially if he was going to present a case that there was no confession. This has previously been the type of strategic decision that this court would never second guess.

¶ 169    Now let us turn to a consideration of how Novak actually functioned in the case. Although the majority failed to do so, it asserts that we must make " 'a realistic appraisal of defense counsel's professional relationship to someone other than the defendant under the circumstances of each case.' " *Supra* ¶ 83 (quoting *People v. Daly*, 341 Ill. App. 3d at 376). Here, Novak's *only* professional relationship was as a defense attorney hired to represent the misdemeanor allegations against Ricky and Austin. What are these other professional relationships to which the majority refers? The majority also claims that the record contains "strong evidence" that Novak was not acting as defense counsel in this case.[14] *Supra* ¶ 101. Really? Novak zealously pursued his clients' position that they did not commit the charged offenses. He cross-examined the State's witnesses, he put on witnesses to dispute the State's version of events, and he forcefully argued that the State had not met its burden of proof. That sounds like a defense attorney. Here, I would turn the majority's statement around on it and ask where is the "strong evidence" that Novak was functioning as a GAL in this case or that he was "attempt[ing] to fulfill the role of GAL" (*supra* ¶ 86)? Where is there *any* evidence that he was acting as the eyes and ears of the court, that he was betraying client confidences, was more interested in the best interests of society, or went against his clients' expressed wishes? The majority seems to suggest that, no matter how effective Novak was, if it can find any examples of how he could have done a better job, this means that he was functioning as a GAL. This is a complete non sequitur. In *any* criminal case, with the benefit of hindsight and the pressure of trial off, a court can always find examples of things that an

---

[14]The majority contradicts itself, however, by also stating that the record "clearly" shows that Novak *was* functioning as defense counsel. *Supra* ¶ 88. So, according to the majority, the record contains strong evidence that Novak was *not* functioning as defense counsel, but it also shows that he *clearly was* functioning as defense counsel. Which is it?

attorney could have done better. How is that *in any way* relevant to determining whether the attorney was functioning as a GAL?

¶ 170    Let us also consider Novak's most important strategic decision as defense counsel—allowing the State to present the testimony of the accusers by way of videotape. Although the majority does not rely on this as support for its conclusion that Novak was not functioning as a defense attorney, this was a principal reason that Austin argued both that Novak was ineffective and that Novak was so conflicted in executing both the role of GAL and defense counsel that reversal was required without proof of prejudice. This is another example of Novak being criticized for effective lawyering.

¶ 171    Novak conceded that he was giving up Austin's and Ricky's right to cross-examine the accusers, but he explained that he had two strategic reasons for doing so: (1) videotaped testimony is less persuasive than live testimony; and (2) if Novak agreed to proceed this way, the State would agree to recommend probation if the minors were adjudicated delinquent. One only needs to review the testimony of the accusers as set forth in the majority opinion to see what a smart choice this was. On the videotape, the accusers both contradicted themselves and told stories that came across as ridiculous on their face. By proceeding by way of videotape, Novak already had the accusers coming across as less than credible, and he was giving the State no opportunity to rehabilitate them. And Novak's strategy worked flawlessly. As the majority concedes, the trial court found that Willie was not credible, Jonathan was only slightly more credible, and that Dillon's testimony was "suspect." Thus, the trial judge found that the testimony, by itself, was insufficient to support an adjudication, and he acquitted Ricky entirely.[15] And, as the judge explained, he adjudicated Austin delinquent only because he found that his admission to one of the acts was proved beyond a reasonable doubt and that the admission, together with the State's other evidence, was sufficient to adjudicate Austin delinquent.[16] The clear implication of the trial court's statement is that, had Austin not confessed, he would have been acquitted too.

¶ 172    Austin argues that, had Novak not agreed to allow the State to proceed by way of videotape, he could have eroded the credibility of his accusers through cross-examination. But their credibility was *already* eroded to the point that it was insufficient, by itself, to support a delinquency adjudication. What more could Novak have hoped to achieve? The far greater risk, as he explained, was that the accusers would come across as *more* credible and believable in court. Also, Novak would have run the risk that, after being prepared to testify by the State, the accusers would no longer contradict themselves or tell unbelievable stories. The State explained as much at the hearing on Austin's motion for a new trial:

> "So, Attorney Novak was confronted with a decision of allowing that in as checkered as it was or requiring us to put on those witnesses. Your honor, I submit

[15]One suspects that Ricky is not losing too much sleep over the constitutionally defective assistance of counsel he received from Novak.

[16]The act that Austin admitted to was letting Dillon perform oral sex on him. This act was corroborated by Dillon's testimony.

that, if we put on those witnesses that could have, that could have resulted in even more damning evidence against Ricky M[.] and Austin M[.] and could have put us in a position to cure the inconsistencies, which were apparent in the videos."

¶ 173　　Novak's decision was clearly wise from a strategic standpoint, and it also shows that he was acting as a defense counsel and not as a GAL. Again, he allowed the State to present testimony that was contradictory and, in many instances, unbelievable on its face. This could only have been a good thing as far as seeking an acquittal was concerned. If he were really just interested in finding out exactly what happened, because of a duty to society, he obviously would have wanted to have the accusers testify in court so that he could probe all of the inconsistencies in their stories and try to get to the bottom of what really happened, even if that meant that they came across as credible and his clients were adjudicated delinquent. But that is not what happened, because Novak was a defense attorney seeking an acquittal.

¶ 174　　The second part of Novak's strategy worked when Austin received a sentence of probation. Again, the State promised to recommend a sentence of probation in exchange for Novak allowing the State to present the accusers' testimony by way of videotape. The trial judge explained that he was sentencing Austin to probation only because he felt bound to honor the agreement that Novak entered into with the State. He felt bound because he had not explained on the record that he would not be bound by the agreement. The clear import of the trial court's words is that he would have preferred to give Austin a more severe sentence.[17] So, both of Novak's strategic decisions for allowing the State to proceed by way of videotape came into play, and both of Novak's strategies worked out exactly as he had planned.

¶ 175　　To sum up, then, when Novak was hired to represent Austin and Ricky, they stood accused of committing multiple sex offenses against multiple victims. *Directly as a result of the strategic decisions Novak made as defense counsel*, Ricky was acquitted entirely, and Austin was adjudicated delinquent only because he admitted to one of the acts that Dillon accused him of. Austin then received a sentence of probation, when the trial judge clearly believed that he should receive a more severe sentence, again solely because of a strategic decision made by Novak. And this is what a majority of the Illinois Supreme Court considers to be a complete denial of counsel in one's defense. For some reason, in considering whether Novak functioned as a defense attorney in this case, the majority focuses not at all on the strategic decisions that Novak made that worked flawlessly, but only on a strategy that he did not pursue that had no chance of succeeding.

---

[17]By the time Austin was sentenced, a sex offender evaluation had been completed and the social worker who completed the evaluation determined that Austin was a high risk to reoffend and that he identified strongly with many of the characteristics of psychopathy or antisocial behavior. Based on this evaluation, the probation officer who completed the presentence report recommended that Austin be remanded to the Illinois Department of Corrections and ordered to a residential sex offender treatment facility.

¶ 176                    III. The Effect of Today's Decision

¶ 177          Perhaps realizing the potentially enormous can of worms it has opened with its automatic reversal rule, the majority takes pains at the end of its opinion to limit the scope of its decision. The court throws in the phrases "[b]ased on the facts of this case" (*supra* ¶ 101) and "under the specific facts of this case" (*supra* ¶ 111) when describing its holding. This court, however, does not issue fact-specific Rule 23 orders. We take questions of general importance and issue binding, precedential opinions for all courts in this state to follow. In this regard, Justice Scalia's observation on the proper role of the Supreme Court *vis-a-vis* all lower courts seems equally applicable to the role of this court *vis-a-vis* the lower courts of Illinois:

> "The Supreme Court of the United States does not sit to announce 'unique' dispositions. Its principal function is to establish *precedent*—that is, to set forth principles of law that every court in America must follow. As we said only this Term, we expect both ourselves and lower courts to adhere to the '*rationale* upon which the Court based the results of its earlier decisions.' *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66-67 (1996) (emphasis added). That is the principal reason we publish our opinions." *United States v. Virginia*, 518 U.S. 515, 596 (1996) (Scalia, J., dissenting).

¶ 178          And what are these "specific facts" to which the court refers? The record shows that Novak performed effectively as defense counsel, employing strategies leading directly to an acquittal for one client and a sentence of probation for the other, but the majority holds that the client who received probation is entitled to an automatic reversal and a new trial, with no showing of prejudice, simply because it found evidence in the record that the attorney had a best interests "mindset" or tried the case with the wrong "tone." Surely my colleagues do not mean to suggest that they would deny the same relief to the next juvenile adjudicated delinquent who can point to evidence in the record showing that his attorney had a best interests mindset. And there is no question that, in any other similar case that comes before the courts, the attorney will have been less effective than Novak. You cannot get much more effective than obtaining an acquittal for the client who did not confess and a sentence of probation for the one who did. The majority must realize that every recently adjudicated juvenile will have his or her attorney scouring the record for the words "best interests" so that he or she may also obtain the automatic reversal and new trial to which the law now entitles them. Is there some principle under which my colleagues believe that they could grant Austin relief, but then deny that same relief to everyone else? If they believe that this decision is *sui generis*, then it is incumbent upon them to explain how, as the lower courts will have to begin applying this decision.


¶ 179                              IV. *Corpus Delicti*

¶ 180          Before concluding this dissent, I wish to briefly address the argument of Justices Freeman and Karmeier that this court should reverse on *corpus delicti* grounds. I will set forth three reasons why this court should not reverse on that basis. Each of these three reasons is, by itself, sufficient to defeat a *corpus delicti* argument, and, taken together, they leave no room at all for a reversal on that basis.

¶ 181    First, Austin has not made a *corpus delicti* corroboration argument, a fact that neither of the specially concurring justices acknowledges. Austin does argue that the evidence was insufficient, but his argument is simply that the victims were not credible and that his confession was unreliable. Austin also incorporates Justice Appleton's appellate court dissent by reference, and Justice Appleton did not argue *corpus delicti* either. See 403 Ill. App. 3d at 687-88 (Appleton, J., dissenting). Moreover, it is entirely clear that this was not a mere oversight but rather a conscious decision by Austin not to raise this argument. How do we know? Two reasons. First, the argument appears in the record and was thus available to be raised on appeal. The attorney whom Austin's parents hired to replace Novak at the hearing on the motion for a new trial made the argument that Austin's confession was not sufficiently corroborated. The attorney never used the words "*corpus delicti,*" instead incorrectly referring to it as a "burden shifting" argument, but the *corpus delicti* argument is there in substance. Second, the State, in its appellee's brief before this court, made a preventative *corpus delicti* argument. The State noted that defendant had not argued *corpus delicti*, but, since the case involved a confession, the State chose to explain why there was no *corpus delicti* issue. What did Austin argue in his reply brief in response to the State's *corpus delicti* argument? "The minor relies on the arguments contained in his original brief." So, even though the argument appeared in the record, and even though the State addressed the argument in its response brief, *Austin refused to make a corpus delicti argument*. Given this, why would this court raise the argument *sua sponte* for Austin and reverse on that basis?

¶ 182    Again, in *Givens*, 237 Ill. 2d at 323-30, this court addressed the propriety of a reviewing court proceeding in such a fashion. *Givens* clearly held that, "*other than for assessing subject matter jurisdiction*, 'a reviewing court should not normally search the record for unargued and unbriefed reasons to *reverse* a trial court's judgment.' " (Emphases added.) *Id*. at 323 (quoting *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 386 (1978)). This court noted that it follows the principle of "party presentation," and explained that courts " 'do not, or should not, sally forth each day looking for wrongs to right.' " *Givens*, 237 Ill. 2d at 323-24 (quoting *Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008)); see also *People v. White*, 2011 IL 109689 ¶ 153 (admonishing the appellate court that reviewing court justices should not be "free rangers riding about the legal landscape looking for law to make"). This court further noted that raising issues on behalf of a party would " 'transform this court's role from that of jurist to that of advocate.' " *Givens*, 237 Ill. 2d at 324 (quoting *People v. Rodriguez*, 336 Ill. App. 3d 1, 14 (2002)). Thus, this court held that the appellate court in that case erred in reversing the defendant's conviction on the basis of an argument that the defendant was not making. *Givens* left open the possibility that, in certain limited cases, it may be appropriate to reverse on a basis that the defendant was not arguing. However, that would only be in a case involving an obvious error controlled by clear precedent. *Givens*, 237 Ill. 2d at 326-29. That is clearly not the case here, as I will explain more fully below. Under no possible circumstances is this a situation where there is an obvious error controlled by clear precedent.[18]

---

[18]One of the reasons that we gave in *Givens* for why we do not raise arguments *sua sponte* on behalf of parties is that it deprives the parties of an opportunity to be heard and requires

-46-

¶ 183    The second reason this court should not reverse on *corpus delicti* grounds is perhaps the most obvious: there is simply no *corpus delicti* problem in this case. Justice Freeman correctly sets forth the black letter *corpus deliciti* law, so I will not repeat all of those principles here. As he correctly notes, Austin's guilt could not have stood solely on his naked confession. Rather, there must have been corroborating evidence tending to establish that the crime occurred. The act that Austin confessed to was allowing Dillon to perform oral sex on him. This confession was corroborated in the strongest way possible: Dillon testified that he performed oral sex on Austin. This is textbook *corpus delicti* corroboration. That is end of the ball game; there is nothing more to say.

¶ 184    Justice Freeman writes that, "convicting a defendant solely on the basis of a confession directly contradicts the *corpus delicti* requirement." *Supra* ¶ 121 (Freeman, J., concurring in part and dissenting in part). There is nothing wrong with this statement, except that it is wholly inapplicable to this case. This is a direct quote from the trial court's order adjudicating Austin delinquent:

>        "This is also, with respect to Austin, a case in which the respondent minor's admission has been proved beyond a reasonable doubt and, *together with the State's other evidence*, is sufficient to meet the State's burden." (Emphasis added.)

The trial judge did not find the corroborating evidence sufficient, by itself, to establish Austin's delinquency beyond a reasonable doubt, but the corroborating evidence does not have to do so. As Justice Freeman concedes, " 'the independent evidence need not establish beyond a reasonable doubt that an offense did occur.' " *Supra* ¶ 118 (Freeman, J., concurring in part and dissenting in part) (quoting *People v. Willingham*, 89 Ill. 2d 352, 361 (1982)). Thus, there is simply no *corpus delicti* problem.

¶ 185    The final reason that Justices Freeman and Karmeier's *corpus delicti* argument is incorrect is that it would require this court to ignore both the trial court's credibility finding and the trial court's interpretation of its own credibility finding. Before explaining why this is so, I must briefly note that the law is not clear in Illinois, or elsewhere, as to what extent witness credibility should come into play in determining whether a confession is sufficiently corroborated. For instance, Justice Freeman cites an Ohio appellate court case that said that "competent and credible evidence" must support the defendant's confession. *Supra* ¶ 120 n.7 (Freeman, J., concurring in part and dissenting in part) (citing *State v. Puckett*, 2010-Ohio-6597, ¶ 15, 947 N.E.2d 730 (Ct. App.)). However, another panel of the Ohio appellate court more directly addressed the question of witness credibility the following year, albeit in an unpublished decision. That panel of the Ohio appellate court, in addressing the defendant's argument that her confession was not sufficiently corroborated, specifically held that witness

---

speculation as to what their arguments would have been. *Givens*, 237 Ill. 2d at 324. Although, as noted, the State made a preventative *corpus delicti* argument, the State obviously would have no way of knowing that members of this court were contemplating adding a witness-credibility component to the corroboration rule, so the State did not weigh in on that point. If this court were to add such a requirement, the time to do so would be in a case in which it was properly raised by the defendant and fully briefed by both parties.

credibility goes only to the weight of the evidence and is not relevant for purposes of the *corpus delicti* rule. *State v. Wright*, 2011-Ohio-5641, ¶ 10 (Ct. App.). Thus, the law in Ohio is far from settled.

¶ 186 Between them, Justices Freeman and Karmeier cite three Illinois cases, but only one of them, *People v. Hubbard*, 38 Ill. 2d 104 (1967), even touches on the issue. *People v. Rivera*, 2011 IL App (2d) 091060, ¶ 41, is cited for the proposition that the State's corroborative evidence must "inspire belief in the defendant's confession." According to Justice Karmeier, the State's independent evidence failed in this regard. *Supra* ¶ 126 (Karmeier, J., concurring in part and dissenting in part). But what could inspire *more* belief in Austin's confession than that the victim testified to *the exact same act* to which Austin confessed? Certainly the fact that the victim testified to the exact same act that Austin confessed to does not give us *less* confidence in Austin's confession. Similarly, Justice Freeman cites *People v. Furby*, 138 Ill. 2d 434, 451 (1990), for the proposition that the independent evidence must be consistent with the confession and tend to confirm or strengthen it. That is a perfect description of what we have here: Austin confessed to having Dillon perform oral sex on him, and Dillon testified to performing oral sex on Austin. Dillon's testimony is consistent with Austin's confession and both confirms and strengthens it.

¶ 187 That leaves only *Hubbard*, a 45-year-old case that is so obviously a relic of another era that it should probably not be cited for anything. In that case, this court independently evaluated the testimony of the complaining witnesses relevant to the incident at hand and noticed contradictions and unexplained gaps in their testimony, and ultimately concluded that their testimony was "so weak as to defy belief." *Hubbard*, 38 Ill. 2d at 110. Thus, the court found that the confession was not sufficiently corroborated. There are several problems with *Hubbard*. First, it predates the United States Supreme Court's decisions in *In re Winship*, 397 U.S. 358 (1970), and *Jackson v. Virginia*, 443 U.S. 307 (1979), and this court's opinion in *People v. Collins*, 106 Ill. 2d 237 (1985). Thus, the standard of review we applied was different. Among other things, *Hubbard* did not acknowledge a duty to view all of the evidence in the light most favorable to the prosecution, did not state that we may not substitute our judgment for the trier of fact on credibility matters, and applied an old rule that this court reviewed the evidence in rape cases differently than in other criminal cases. Thus, this court engaged in its own weighing of the evidence and made its own credibility determination and simply declared that the two women who testified to being raped at the hands of the defendant were unworthy of belief. Thus, this court held that the defendant's admission to raping the two women was not sufficiently corroborated. *Hubbard*, 38 Ill. 2d at 109-11. It is impossible to believe that *Hubbard* would be decided the same way today. Indeed, our standard of review would forbid it. Moreover, it is questionable whether *Hubbard* lasted even five years. In *People v. Springs*, 51 Ill. 2d 418, 425-26 (1972), this court clarified that its duty to carefully examine the record in rape cases did not mean that the court could "encroach upon the function of the jury to weigh credibility and otherwise assess the evidence presented in the course of the trial." See also *People v. Reese*, 54 Ill. 2d 51, 57-58 (1973) (same).

¶ 188 Assuming that *Hubbard* even survived *Springs* and *Reese*, the *most* that it can be said to stand for is the proposition that when the corroborating evidence is "so weak as to defy

belief" it amounts to no corroboration at all. That is clearly not what the trial court found here. Justice Karmeier states that the trial court "never found the testimony of the minors to be credible" (*supra* ¶ 126 (Karmeier, J., concurring in part and dissenting in part)), and Justice Freeman states that the trial court "found the testimony of the minors not to be credible" (*supra* ¶ 121 (Freeman, J., concurring in part and dissenting in part)). However, the only witness that the trial court found completely lacking in credibility was Willie. The trial court specifically found Jonathan slightly more credible than Willie and said with respect to Dillon only that his testimony was "suspect." And with respect to each, he specifically listed those matters that he thought their testimony was suspect on. Then, the trial court said that the testimony of the minors *was* sufficient to convince him that something had probably happened, but that it fell short of the reasonable doubt standard. Obviously, then, the trial court did not find the victims completely lacking in credibility, let alone that their testimony was "so weak as to defy belief." Otherwise, he would not have been convinced by their testimony that something probably happened.

¶ 189     This matter was specifically brought to the trial court's attention during the hearing on Austin's motion for new a trial, and the trial court explained that it did not find the victims completely lacking in credibility. Defendant argued at that hearing that Austin's confession was not sufficiently corroborated because of the trial court's credibility finding, and the trial court responded that, "I also found the State introduced evidence sufficient to prove that something probably happened but not beyond a reasonable doubt. That's corroborative isn't it?" To which Austin's attorney replied, "That's somewhat corroborative, but as I said, I don't believe it meets the standard of proof beyond a reasonable doubt."[19]

¶ 190     Clearly, then, the trial court did not find the victims completely lacking in credibility. Just as we may not substitute our judgment for that of the trial court on matters of witness credibility, we should not substitute our judgment for that of the trial court on how to interpret the court's own credibility finding. Even Austin's attorney agreed that the evidence was corroborative, but argued that it fell below the reasonable doubt standard. But, as we have already established, the corroborative evidence does not need to meet that standard. So, while the specially concurring justices may believe that the victims were completely lacking in credibility, that is clearly *not* what the trial court found, and we may not substitute our judgment for the trial court's on this matter.

¶ 191     In sum, there is simply no *corpus delicti* problem in this case, and Austin has not even contended that there is. The specially concurring justices provide no more of a valid basis to reverse Austin's adjudication than does the majority.

¶ 192                                              V. Conclusion

¶ 193     I agree entirely with my colleagues' conclusion that Austin was entitled to the assistance of counsel in his defense. Unlike my colleagues, however, I believe that this is exactly what Austin received. The record shows beyond all doubt that Novak was never appointed as GAL

---

[19]Austin's replacement attorney's concession that the confession was corroborated may be one reason why he chose to forgo raising that argument on appeal.

and never attempted to fulfill that role. He fulfilled only one role—that of defense counsel—and he did so quite well. There is *no support at all* for the majority's conclusion that Novak "was not acting as defense counsel." *Supra* ¶ 101. I express no opinion on whether a *per se* conflict of interest exists when an attorney functions as both defense counsel and GAL, as that issue is not before the court. I note that the points I have raised in this dissent stand entirely unrebutted by the majority.

¶ 194 My colleagues' desire to reach the issue as briefed by Austin is certainly understandable. Whether a defense attorney can act as both GAL and defense counsel is an important issue worthy of this court's attention. Whether Novak properly performed his role as defense counsel in this particular case is not an important issue that demands this court's attention. It is certainly unfortunate that the appellate court made this case about something that it is not. All of that said, this court must adjudicate the case that is before it, and we should not overreach and issue an advisory opinion simply because we want to decide an issue. It is not even arguable that this case presents the question of whether an attorney may serve as both GAL and defense counsel, and this court should have rejected Austin's claim as an improper request for this court to issue an advisory opinion on a set of facts not before the court. Moreover, the majority's criticisms of Novak are truly regrettable given that he did absolutely nothing wrong and functioned as an entirely effective defense counsel for his clients.

¶ 195 I dissent.